# WONG YANG SUNG *v.* McGRATH, ATTORNEY GENERAL, ET AL.

No. 154.   Argued December 6, 1949.—Decided February 20, 1950.

34

*Irving Jaffe* argued the cause for petitioner.    With him on the brief were *Jack Wasserman, Gaspare Cusumano* and *Thomas A. Farrell.*

*Robert W. Ginnane* argued the cause for respondents. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell, Robert S. Erdahl, L. Paul Winings* and *Charles Gordon.*

*Wendell Berge, A. Alvis Layne, Jr.* and *John B. Gage* filed a brief for Riss & Co., Inc., as *amicus curiae,* supporting petitioner.

Mr. Justice Jackson delivered the opinion of the Court.

This *habeas corpus* proceeding involves a single ultimate question—whether administrative hearings in deportation cases must conform to requirements of the Administrative Procedure Act of June 11, 1946, 60 Stat. 237, 5 U. S. C. §§ 1001 *et seq.*

Wong Yang Sung, native and citizen of China, was arrested by immigration officials on a charge of being unlawfully in the United States through having overstayed shore leave as one of a shipping crew. A hearing was held before an immigrant inspector who recommended deportation. The Acting Commissioner approved; and the Board of Immigration Appeals affirmed.

Wong Yang Sung then sought release from custody by *habeas corpus* proceedings in District Court for the District of Columbia, upon the sole ground that the administrative hearing was not conducted in conformity with §§ 5 and 11 of the Administrative Procedure Act.[1]

---

[1] Particularly invoked are § 5 (c), 60 Stat. 237, 240, 5 U. S. C. § 1004 (c), which provides in part:

"The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency. Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency. No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings. . . ."; and § 11, 60 Stat. at 244, 5 ·U. S. C. § 1010, which provides in part: "Subject to the civil-service

The Government admitted noncompliance, but asserted that the Act did not apply. The court, after hearing, discharged the writ and remanded the prisoner to custody, holding the Administrative Procedure Act inapplicable to deportation hearings. 80 F. Supp. 235. The Court of Appeals affirmed. 84 U. S. App. D. C. 419, 174 F. 2d 158. Prisoner's petition for certiorari was not opposed by the Government and, because the question presented has obvious importance in the administration of the immigration laws, we granted review. 338 U. S. 812.

I.

The Administrative Procedure Act of June 11, 1946, *supra,* is a new, basic and comprehensive regulation of procedures in many agencies, more than a few of which can advance arguments that its generalities should not or do not include them. Determination of questions of its coverage may well be approached through consideration of its purposes as disclosed by its background.

Multiplication of federal administrative agencies and expansion of their functions to include adjudications

---

and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (hereinafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recommendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. . . ."

which have serious impact on private rights has been one of the dramatic legal developments of the past half-century.[2] Partly from restriction by statute, partly from judicial self-restraint, and partly by necessity—from the nature of their multitudinous and semilegislative or executive tasks—the decisions of administrative tribunals were accorded considerable finality, and especially with respect to fact finding.[3] The conviction developed, particularly within the legal profession, that this power was not sufficiently safeguarded and sometimes was put to arbitrary and biased use.[4]

Concern over administrative impartiality and response to growing discontent was reflected in Congress as early as 1929, when Senator Norris introduced a bill to create

---

[2] See e. g., Blachly and Oatman, Administrative Legislation and Adjudication 1 (1934); Landis, The Administrative Process 1 (1938); Pound, Administrative Law 27 (1942); Carrow, The Background of Administrative Law 1 (1948); The Federal Administrative Procedure Act and the Administrative Agencies 4 (N. Y. U. 1947); Final Report of Attorney General's Committee on Administrative Procedure 7 (1941), contained in S. Doc. No. 8, 77th Cong., 1st Sess. (1941); Cushman, The Independent Regulatory Commissions, cc. II–V (1941); Frankfurter, The Task of Administrative Law, 75 U. of Pa. L. Rev. 614 (1927); materials cited in n. 4, infra.

[3] See e. g., Dickinson, Administrative Justice and the Supremacy of Law, passim (1927); Final Report of Attorney General's Committee on Administrative Procedure, supra, at 11–18, 75–92; and see materials cited in n. 4, infra.

[4] E. g., Root, Public Service by the Bar, 41 A. B. A. Rep. 355, 368 (1916); Hughes, Some Aspects of the Development of American Law, 39 N. Y. B. A. Rep. 266, 269 (1916); Sutherland, Private Rights and Government Control, 42 A. B. A. Rep. 197, 205 (1917); Address of President Guthrie, 46 N. Y. B. A. Rep. 169, 186 (1923). After 1933, when the American Bar Association formed a Special Committee on Administrative Law, the Bar's concern can be traced in this Committee's reports. E. g., 58 A. B. A. Rep. 197, 407 (1933); 59 A. B. A. Rep. 539 (1934); 61 A. B. A. Rep. 720 (1936); 62 A. B. A. Rep. 789 (1937).

a separate administrative court.[5]   Fears and dissatisfactions increased as tribunals grew in number and jurisdiction, and a succession of bills offering various remedies appeared in Congress.[6]   Inquiries into the practices of state agencies, which tended to parallel or follow the federal pattern, were instituted in several states, and some studies noteworthy for thoroughness, impartiality and vision resulted.[7]

The Executive Branch of the Federal Government also became concerned as to whether the structure and procedure of these bodies was conducive to fairness in the administrative process.   President Roosevelt's Committee on Administrative Management in 1937 recommended complete separation of adjudicating functions and personnel from those having to do with investigation or prosecution.[8]   The President early in 1939 also directed the Attorney General to name "a committee of eminent lawyers, jurists, scholars, and administrators to review the entire administrative process in the various

[5] S. 5154, 70th Cong., 2d Sess. (1929).

[6] S. 1835, 73d Cong., 1st Sess. (1933); S. 3787, H. R. 12297, 74th Cong., 2d Sess. (1936); S. 3676, 75th Cong., 3d Sess. (1938); H. R. 6324, H. R. 4235, H. R. 4236, S. 915, S. 916, 76th Cong., 1st Sess. (1939); S. 674, S. 675, S. 918, H. R. 3464, H. R. 4238, H. R. 4782, 77th Cong., 1st Sess. (1941); H. R. 4314, H. R. 5081, H. R. 5237, S. 2030, 78th Cong., 2d Sess. (1944); H. R. 1203, S. 7, 79th Cong., 1st Sess. (1945).

[7] E. g., Benjamin, Administrative Adjudication in the State of New York (1942); Tenth Biennial Report of the Judicial Council to the Governor and Legislature of California (1944). See also Fesler, The Independence of State Regulatory Agencies (1942); Handbook of the National Conference of Commissioners on Uniform State Laws, 226 et seq. (1943); 63 A. B. A. Rep. 623 (1938).

[8] Administrative Management in the Government of the United States, Report of the President's Committee on Administrative Management 37 (1937).

departments of the executive Government and to recommend improvements, including the suggestion of any needed legislation." [9]

So strong was the demand for reform, however, that Congress did not await the Committee's report but passed what was known as the Walter-Logan bill, a comprehensive and rigid prescription of standardized procedures for administrative agencies.[10]  This bill was vetoed by President Roosevelt December 18, 1940,[11] and the veto was sustained by the House.[12]  But the President's veto message made no denial of the need for reform.  Rather it pointed out that the task of the Committee, whose objective was "to suggest improvements to make the process more workable and more just," had proved "unexpectedly complex."  The President said, "I should desire to await their report and recommendations before approving any measure in this complicated field." [13]

The committee divided in its views and both the majority and the minority submitted bills [14] which were introduced in 1941.  A subcommittee of the Senate Judiciary Committee held exhaustive hearings on three proposed

---

[9] The quoted statement is from President Roosevelt's message to Congress of December 18, 1940, vetoing H. R. 6324, the so-called Walter-Logan bill.  H. R. Doc. No. 986, 76th Cong., 3d Sess., 3–4 (1940).  The origin and orders leading to the creation of the Attorney General's Committee are set out in Appendix A of the Committee's Final Report, supra.

[10] S. 915, H. R. 6324, 76th Cong., 1st Sess. (1939).

[11] 86 Cong. Rec. 13942–3 (1940), reprinted in H. R. Doc. No. 986, 76th Cong., 3d Sess. (1940).

[12] 86 Cong. Rec. 13953 (1940).

[13] 86 Cong. Rec. at 13943; H. R. Doc. No. 986, supra, 4.

[14] These bills appear at pp. 192 and 217 of the Committee's Final Report, supra.  The majority bill became S. 675, 77th Cong., 1st Sess. (1941) and the minority recommendation was embodied in S. 674, 77th Cong., 1st Sess. (1941).

40

measures,[15] but, before the gathering storm of national emergency and war, consideration of the problem was put aside. Though bills on the subject reappeared in 1944,[16] they did not attract much attention.

The McCarran-Sumners bill, which evolved into the present Act, was introduced in 1945.[17] Its consideration and hearing, especially of agency interests, was painstaking. All administrative agencies were invited to submit their views in writing. A tentative revised bill was then prepared and interested parties again were invited to submit criticisms.[18] The Attorney General named representatives of the Department of Justice to canvass the agencies and report their criticisms, and submitted a favorable report on the bill as finally revised.[19] It passed both Houses without opposition and was signed by President Truman June 11, 1946.[20]

The Act thus represents a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest. It contains many compromises and generalities and, no doubt, some am-

[15] The hearings ran from April 2 to July 2, 1941, and, with an appendix, have been collected in four parts and over 1,600 pages. Hearings before Subcommittee of the Committee on the Judiciary on S. 674, S. 675 and S. 918, 77th Cong., 1st Sess. (1941).

[16] H. R. 4314, H. R. 5081, H. R. 5237, S. 2030, 78th Cong., 2d Sess. (1944).

[17] S. 7 and H. R. 1203, 79th Cong., 1st Sess. (1945).

[18] See H. R. Rep. No. 1980, 79th Cong., 2d Sess. 14–15 (1946); S. Rep. No. 752, 79th Cong., 1st Sess. 4–5 (1945), reprinted in S. Doc. No. 248, 79th Cong., 2d Sess., at 233, 248–249, and 185, 190–191, respectively.

[19] S. Rep. No. 752, 79th Cong., 1st Sess. 37–45 (1945); 92 Cong. Rec. App. A–2982–5 (1946).

[20] 92 Cong. Rec. 2167 (1946) (passage by the Senate); 92 Cong. Rec. 5668 (1946) (amended version passed by House); 92 Cong. Rec. 5791 (1946) (House version agreed to by Senate); 92 Cong. Rec. 6706 (1946) (approved by the President).

biguities. Experience may reveal defects. But it would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the Act warrant, to give effect to its remedial purposes where the evils it was aimed at appear.

## II.

Of the several administrative evils sought to be cured or minimized, only two are particularly relevant to issues before us today. One purpose was to introduce greater uniformity of procedure and standardization of administrative practice among the diverse agencies whose customs had departed widely from each other.[21] We pursue this no further than to note that any exception we may find to its applicability would tend to defeat this purpose.

More fundamental, however, was the purpose to curtail and change the practice of embodying in one person or agency the duties of prosecutor and judge. The President's Committee on Administrative Management voiced in 1937 the theme which, with variations in language, was reiterated throughout the legislative history of the Act. The Committee's report, which President Roosevelt transmitted to Congress with his approval as "a great document of permanent importance," [22] said:

"... the independent commission is obliged to carry on judicial functions under conditions which

---

[21] H. R. Rep. No. 1980, 79th Cong., 2d Sess. 16 (1946); Final Report of the Attorney General's Committee on Administrative Procedure, 20 (1941); McFarland, Analysis of the Federal Administrative Procedure Act, in Federal Administrative Procedure Act and the Administrative Agencies 16, 22 (N. Y. U. 1947). See also Hearings before Subcommittee No. 4 of the House Committee on the Judiciary on H. R. 4236, H. R. 6198, and H. R. 6324, 76th Cong., 1st Sess. 14, 31 (1939); S. Rep. No. 442, 76th Cong., 1st Sess. 9 (1939); H. R. Rep. No. 1149, 76th Cong., 1st Sess. 2–3 (1939); S. Doc. No. 71, 76th Cong., 1st Sess. 5 (1939).

[22] 81 Cong. Rec. 187, 191 (1937).

threaten the impartial performance of that judicial work. The discretionary work of the administrator is merged with that of the judge. Pressures and influences properly enough directed toward officers responsible for formulating and administering policy constitute an unwholesome atmosphere in which to adjudicate private rights. But the mixed duties of the commissions render escape from these subversive influences impossible.

"Furthermore, the same men are obliged to serve both as prosecutors and as judges. This not only undermines judicial fairness; it weakens public confidence in that fairness. Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings which the commission, in the role of prosecutor, presented to itself." Administrative Management in the Government of the United States, Report of the President's Committee on Administrative Management, 36–37 (1937).

The Committee therefore recommended a redistribution of functions within the regulatory agencies. "[I]t would be divided into an administrative section and a judicial section" and the administrative section "would formulate rules, initiate action, investigate complaints . . ." and the judicial section "would sit as an impartial, independent body to make decisions affecting the public interest and private rights upon the basis of the records and findings presented to it by the administrative section." *Id.* at 37.

Another study was made by a distinguished committee named by the Secretary of Labor, whose jurisdiction at the time included the Immigration and Naturalization Service. Some of the committee's observations have relevancy to the procedure under examination here. It said:

"The inspector who presides over the formal hearing is in many respects comparable to a trial judge. He has, at a minimum, the function of determining—subject to objection on the alien's behalf—what goes into the written record upon which decision ultimately is to be based. Under the existing practice he has also the function of counsel representing the moving party—he does not merely admit evidence against the alien; he has the responsibility of seeing that such evidence is put into the record. The precise scope of his appropriate functions is the first question to be considered." The Secretary of Labor's Committee on Administrative Procedure, The Immigration and Naturalization Service, 77 (Mimeo. 1940).

Further:

"Merely to provide that in particular cases different inspectors shall investigate and hear is an insufficient guarantee of insulation and independence of the presiding official. The present organization of the field staff not only gives work of both kinds commonly to the same inspector but tends toward an identity of viewpoint as between inspectors who are chiefly doing only one or the other kind of work. . . .

". . . We recommend that the presiding inspectors be relieved of their present duties of presenting the case against aliens and be confirmed [sic] entirely to the duties customary for a judge. This, of course, would require the assignment of another officer to perform the task of a prosecuting attorney. The appropriate officer for this purpose would seem to be the investigating inspector who, having prepared the case against the alien, is already thoroughly familiar with it. . . .

"A genuinely impartial hearing, conducted with critical detachment, is psychologically improbable if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible. Nor is complete divorce between investigation and hearing possible so long as the presiding inspector has the duty himself of assembling and presenting the results of the investigation. . . ." *Id.* at 81–82.

And the Attorney General's Committee on Administrative Procedure, which divided as to the appropriate remedy,[23] was unanimous that this evil existed. Its Final Report said:

"These types of commingling of functions of investigation or advocacy with the function of deciding are thus plainly undesirable. But they are also avoidable and should be avoided by appropriate internal division of labor. For the disqualifications produced by investigation or advocacy are personal psychological ones which result from engaging in those types of activity; and the problem is simply one of isolating those who engage in the activity. Creation of independent hearing commissioners insulated from all phases of a case other than hearing and deciding will, the Committee believes, go far toward solving this problem at the level of the initial hearing provided the proper safeguards are established to assure the insulation. . . ." Rep. Atty. Gen. Comm. Ad. Proc. 56 (1941), S. Doc. No. 8, 77th Cong., 1st Sess. 56 (1941).

The Act before us adopts in general this recommended form of remedial action. A minority of the Committee had, furthermore, urged an even more thoroughgoing

---

[23] See n. 14, *supra.*

separation and supported it with a cogent report. *Id.* at 203 *et seq.*

Such were the evils found by disinterested and competent students. Such were the facts before Congress which gave impetus to the demand for the reform which this Act was intended to accomplish. It is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act, to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns.

## III.

Turning now to the case before us, we find the administrative hearing a perfect exemplification of the practices so unanimously condemned.

This hearing, which followed the uniform practice of the Immigration Service,[24] was before an immigrant inspector, who, for purposes of the hearing, is called the "presiding inspector." Except with consent of the alien, the presiding inspector may not be the one who investigated the case. 8 C. F. R. 150.6 (b).[25] But the inspector's duties include investigation of like cases; and while he is today hearing cases investigated by a colleague, tomorrow his investigation of a case may be heard before the inspector whose case he passes on today. An "examining inspector" may be designated to conduct the prosecution, 8 C. F. R. 150.6 (n), but none was in this case; and, in any event, the examining inspector also has the same mixed prosecutive and hearing functions. The presiding

---

[24] See 8 C. F. R. 150.1 *et seq.*

[25] The initial step in a deportation case is the investigation of an alien by an immigrant inspector. 8 C. F. R. 150.1. This is followed by issuance of a warrant of arrest, 8 C. F. R. 150.2–150.4, and incarceration, unless the alien is released under bond. 8 C. F. R. 150.5. The formal hearing follows.

inspector, when no examining inspector is present, is required to "conduct the interrogation of the alien and the witnesses in behalf of the Government and shall cross-examine the alien's witnesses and present such evidence as is necessary to support the charges in the warrant of arrest." 8 C. F. R. 150.6 (b). It may even become his duty to lodge an additional charge against the alien and proceed to hear his own accusation in like manner. 8 C. F. R. 150.6 (1). Then, as soon as practicable, he is to prepare a summary of the evidence, proposed findings of fact, conclusions of law, and a proposed order. A copy is furnished the alien or his counsel, who may file exceptions and brief, 8 C. F. R. 150.7, whereupon the whole is forwarded to the Commissioner. 8 C. F. R. 150.9.

The Administrative Procedure Act did not go so far as to require a complete separation of investigating and prosecuting functions from adjudicating functions. But that the safeguards it did set up were intended to ameliorate the evils from the commingling of functions as exemplified here is beyond doubt. And this commingling, if objectionable anywhere, would seem to be particularly so in the deportation proceeding, where we frequently meet with a voteless class of litigants who not only lack the influence of citizens, but who are strangers to the laws and customs in which they find themselves involved and who often do not even understand the tongue in which they are accused. Nothing in the nature of the parties or proceedings suggests that we should strain to exempt deportation proceedings from reforms in administrative procedure applicable generally to federal agencies.

Nor can we accord any weight to the argument that to apply the Act to such hearings will cause inconvenience and added expense to the Immigration Service. Of course it will, as it will to nearly every agency to which it is applied. But the power of the purse belongs to Congress, and Congress has determined that the price

for greater fairness is not too high. The agencies, unlike the aliens, have ready and persuasive access to the legislative ear and if error is made by including them, relief from Congress is a simple matter.

This brings us to contentions both parties have advanced based on the pendency in Congress of bills to exempt this agency from the Act. Following an adverse decision,[26] the Department asked Congress for exempting legislation,[27] which appropriate committees of both Houses reported favorably but in different form and substance.[28] Congress adjourned without further action. The Government argues that Congress knows that the Immigration Service has construed the Act as not applying to deportation proceedings, and that it "has taken no action indicating disagreement with that interpretation"; that therefore it "is at least arguable that Congress was prepared to specifically confirm the administrative construction by clarifying legislation." We do not think we can draw that inference from incompleted steps in the legislative process. Cf. Helvering v. Hallock, 309 U. S. 106, 119–120.

On the other hand, we will not draw the inference, urged by petitioner, that an agency admits that it is acting upon a wrong construction by seeking ratification from Congress. Public policy requires that agencies feel free to ask legislation which will terminate or avoid adverse contentions and litigations. We do not feel justified in holding that a request for and failure to get in a single session of Congress clarifying legislation on a genuinely debatable point of agency procedure admits weakness in the agency's contentions. We draw, therefore, no inference in favor of either construction of the Act—from the

[26] Eisler v. Clark (D. D. C. 1948), 77 F. Supp. 610.

[27] S. 2755 and H. R. 6652, 80th Cong., 2d Sess. (1948).

[28] S. Rep. No. 1588, H. R. Rep. No. 2140, 80th Cong., 2d Sess. (1948).

Department's request for legislative clarification, from the congressional committees' willingness to consider it, or from Congress' failure to enact it.

We come, then, to examination of the text of the Act to determine whether the Government is right in its contentions: first, that the general scope of § 5 of the Act does not cover deportation proceedings; and, second, that even if it does, the proceedings are excluded from the requirements of the Act by virtue of § 7.

## IV.

The Administrative Procedure Act, § 5, establishes a number of formal requirements to be applicable "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." The argument here depends upon the words "adjudication required by statute." The Government contends that there is no express requirement for any hearing or adjudication in the statute authorizing deportation,[29] and that this omission shields these proceedings from the impact of § 5. Petitioner, on the other hand, contends that deportation hearings, though not expressly required by statute, are required under the decisions of this Court,[30]

---

[29] Section 19 (a) of the Immigration Act of February 5, 1917, 39 Stat. 874, 889, as amended, 8 U. S. C. § 155 (a), provides in part:

". . . any alien who shall have entered or who shall be found in the United States in violation of this Act, or in violation of any other law of the United States . . . shall, upon the warrant of the Attorney General, be taken into custody and deported. . . . In every case where any person is ordered deported from the United States under the provisions of this Act, or of any law or treaty, the decision of the Attorney General shall be final." See Note 33, *infra*.

[30] *The Japanese Immigrant Case,* 189 U. S. 86, 100, 101; *Kwock Jan Fat* v. *White,* 253 U. S. 454, 459, 464; *Bridges* v. *Wixon,* 326 U. S. 135, 160 (concurring opinion).

and the proceedings, therefore, are within the scope of § 5.

Both parties invoke many citations to legislative history as to the meaning given to these key words by the framers, advocates or opponents of the Administrative Procedure Act. Because § 5 in the original bill applied to hearings required "by law," [31] because it was suggested by the Attorney General that it should be changed to "required by statute or Constitution," [32] and because it finally emerged "required by statute," the Government argues that the section is intended to apply only when explicit statutory words granting a right to adjudication can be pointed out. Petitioner on the other hand cites references which would indicate that the limitation to statutory hearing was merely to avoid creating by inference a new right to hearings where no right existed otherwise. We do not know. The legislative history is more conflicting than the text is ambiguous.

But the difficulty with any argument premised on the proposition that the deportation statute does not require a hearing is that, without such hearing, there would be no constitutional authority for deportation. The constitutional requirement of procedural due process of law derives from the same source as Congress' power to legislate and, where applicable, permeates every valid enactment of that body. It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing at least for aliens who had not entered clandestinely and

---

[31] Section 301 of the bills proposed in the majority and minority recommendations of the Final Report of the Attorney General's Committee on Administrative Procedure, pp. 195, 232–233.

[32] Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. 674, S. 675 and S. 918, 77th Cong., 1st Sess. 1456 (1941).

who had been here some time even if illegally. The Court said:

"This is the reasonable construction of the acts of Congress here in question, and they need not be otherwise interpreted. In the case of all acts of Congress, such interpretation ought to be adopted as, without doing violence to the import of the words used, will bring them into harmony with the Constitution." *The Japanese Immigrant Case,* 189 U. S. 86, 101.

We think that the limitation to hearings "required by statute" in § 5 of the Administrative Procedure Act exempts from that section's application only those hearings which administrative agencies may hold by regulation, rule, custom, or special dispensation; not those held by compulsion. We do not think the limiting words render the Administrative Procedure Act inapplicable to hearings, the requirement for which has been read into a statute by the Court in order to save the statute from invalidity. They exempt hearings of less than statutory authority, not those of more than statutory authority. We would hardly attribute to Congress a purpose to be less scrupulous about the fairness of a hearing necessitated by the Constitution than one granted by it as a matter of expediency.

Indeed, to so construe the Immigration Act might again bring it into constitutional jeopardy. When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets at least currently prevailing standards of impartiality. A deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself. It might be difficult to justify as measuring up to constitutional standards of impartiality a hearing tribunal for deportation proceed-

ings the like of which has been condemned by Congress as unfair even where less vital matters of property rights are at stake.

We hold that the Administrative Procedure Act, § 5, does cover deportation proceedings conducted by the Immigration Service.

## V.

The remaining question is whether the exception of § 7 (a) of the Administrative Procedure Act exempts deportation hearings held before immigrant inspectors. It provides:

"SEC. 7. In hearings which section 4 or 5 requires to be conducted pursuant to this section—

"(a) PRESIDING OFFICERS.—There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute. . . ." 60 Stat. 237, 241, 5 U. S. C. § 1006.

The Government argues that immigrant inspectors are "specially provided for by or designated pursuant to" § 16 of the Immigration Act, which, in pertinent part, reads:

". . . The inspection . . . of aliens, including those seeking admission or readmission to or the privilege of passing through or residing in the United States, and the examination of aliens arrested within the United States under this Act,[33] shall be conducted by

---

[33] The original Act, 39 Stat. 886, reads "under this Act," although in the codification, 8 U. S. C. § 152, it reads "under this section." The former is controlling. 1 U. S. C. (Supp. II, 1949) §§ 112, 204 (a).

immigrant inspectors, except as hereinafter provided in regard to boards of special inquiry. . . . Said inspectors shall have power to administer oaths and to take and consider evidence touching the right of any alien to enter, reenter, pass through, or reside in the United States, and, where such action may be necessary, to make a written record of such evidence; . . ." 39 Stat. 874, 885, as amended, 8 U. S. C. § 152.

Certainly nothing here specifically provides that immigrant inspectors shall conduct deportation hearings or be designated to do so. This language does direct them to conduct border inspections of aliens seeking admission. They may administer oaths and take, record, and consider evidence. But these functions are indispensable to investigations which are concededly within their competence. And these functions are likewise necessary to enable the preparation of complaints for prosecutive purposes. But that Congress by grant of these powers has specially constituted them or provided for their designation as hearing officers in deportation proceedings does not appear.

Section 7 (a) qualifies as presiding officers at hearings the agency and one or more of the members of the body comprising the agency, and it also leaves untouched any others whose responsibilities and duties as hearing officers are established by other statutory provision. But if hearings are to be had before employees whose responsibility and authority derives from a lesser source, they must be examiners whose independence and tenure are so guarded by the Act as to give the assurances of neutrality which Congress thought would guarantee the impartiality of the administrative process.

We find no basis in the purposes, history or text of this Act for judicially declaring an exemption in favor of deportation proceedings from the procedural safeguards

enacted for general application to administrative agencies. We hold that deportation proceedings must conform to the requirements of the Administrative Procedure Act if resulting orders are to have validity. Since the proceeding in the case before us did not comply with these requirements, we sustain the writ of *habeas corpus* and direct release of the prisoner.\*

*Reversed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE REED, dissenting.

The Court, it seems to me, has disregarded a congressional exemption of certain agencies, including the Immigration and Naturalization Service, from some of the requirements of the Administrative Procedure Act. Such judicial intrusion into the legislative domain justifies a protest. It may be useful to call attention to the necessity of recognizing specific exceptions to general rules. This protest is rested on the ground that immigrant inspectors performing duties under § 16 of the Immigration Act are within the exception provided by § 7 (a) of the Administrative Procedure Act. The Court's opinion discusses this point under subdivision V. The sections are there set out and can be examined by the reader.

In this case no one questions the constitutionality of the hearing Wong received before the immigrant inspector, with administrative review by the Commissioner and the Board of Immigration Appeals. The question on which I disagree with the Court is whether the Administrative Procedure Act permits an inspector of the Immigration and Naturalization Service to serve as a presiding officer at a deportation hearing.

---

\*[For order modifying the judgment, see *post,* p. 908.]

54

Section 7 (a) of the Administrative Procedure Act provides that the official presiding at the taking of evidence shall be an agency, an agency member or an examiner appointed under that Act. There is an exception to this requirement. It reads as follows:

> "but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute."

It is this exception that made it proper for an immigrant inspector to preside at this deportation hearing.

Under § 16 of the Immigration Act, 39 Stat. 874, 885, the

> "inspection . . . of aliens, including those seeking admission or readmission to or the privilege of passing through or residing in the United States, and the examination of aliens arrested within the United States under this Act, shall be conducted by immigrant inspectors, . . . . Said inspectors shall have power to administer oaths and to take and consider evidence touching the right of any alien to enter, reenter, pass through, or reside in the United States, and, where such action may be necessary, to make a written record of such evidence; . . . ."

It seems to me obvious that the exception provided in § 7 (a) covers immigrant inspectors dealing with the arrest of an alien for violation of the Immigration Act. The examination of arrested aliens at a deportation proceeding is surely a specified class of proceedings under § 7 (a) of the Administrative Procedure Act, and it is surely conducted by an officer "specially provided for by . . . statute."

The reason for the exception in § 7 (a) was not spelled out in the legislative history or in the Act itself. The

exception may have been made to retain smoothness of operation in the several agencies where there were officials specially provided for by statute or designated pursuant to a statute. When making exceptions from the requirements as to separation of the investigatory and adjudicatory functions, it was natural to include officers specially designated by statute to sit in judgment. Agency members are excluded from these requirements of the Administrative Procedure Act. They, too, have investigatory and adjudicatory duties. Since the members of the agency and the statutorily designated officers were specially selected for the functions they were to perform, Congress probably reposed confidence in their experience and expertness. It doubtless did not wish to disorganize administration until time showed whether that confidence was well placed.[1]

Since the Court does not accept my view of the reach of § 7 (a), it would be useless to undertake an analysis of the other questions presented by the petition for certiorari.

---

[1] Thus the congressional committee warned that should the exception "be a loophole for avoidance of the examiner system in any real sense, corrective legislation would be necessary. That provision is not intended to permit agencies to avoid the use of examiners but to preserve special statutory types of hearing officers who contribute something more than examiners could contribute and at the same time assure the parties fair and impartial procedure." S. Doc. No. 248, 79th Cong., 2d Sess., p. 216.