George B. PETITE, Appellant,

v.

UNITED STATES of America, Appellee.

No. 7694.

United States Court of Appeals Fourth Circuit.

Argued Nov. 5, 1958.

Decided Jan. 5, 1959.

Bernard J. Flynn and Louis R. Milio, Baltimore, Md. (B. Sydney Becker, Ginsberg & Ginsberg, and Hyman Ginsberg, Baltimore, Md. on the brief) for appellant.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md., and Arnold M. Weiner, Asst. U. S. Atty., Baltimore, Md., for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and BOREMAN, District Judge.

BOREMAN, District Judge.

This is an appeal by George B. Petite, a member of the Bar of Baltimore City, from a sentence of imprisonment imposed by the United States District Court for the District of Maryland, the appellant having been convicted by a jury of the crime of subornation of perjury on two separate counts of an indictment.

The first count of the indictment charged that the appellant, hereinafter referred to as the defendant, procured Georgios Modestou Kostatos to commit perjury in a hearing conducted by the Immigration and Naturalization Service on February 14, 1952. The second count charges that the defendant procured Eleftherios Sitaras, of Baltimore, Maryland, to commit perjury in a hearing conducted by the Immigration and Naturalization Service on June 16, 1952. Both hearings were in Baltimore, Maryland, and were held in connection with a deportation proceeding against Kostatos, the perjurer named in the first count.

On October 12, 1951, Georgios Modestou Kostatos, a native of Greece and a Greek citizen, arrived at the Port of Baltimore as a crewman on the S. S. Santa Irene. When the ship left Baltimore the next day, Kostatos was not aboard and, ten days later, on October 23, 1951, he was arrested on a warrant

charging that "at the time of entry, he was an immigrant not in possession of a valid immigration visa". Kostatos appeared at a deportation hearing on February 14, 1952, to show cause why he should not be deported. The defendant entered a formal appearance in the case as counsel for Kostatos, and the defense against deportation was that Kostatos was an American citizen and not an immigrant. John V. Carney, a Deportation Examiner, was the presiding officer and administered the oath to the witness Kostatos.

When questioned by the defendant, as his counsel, Kostatos claimed that his real name was John George Sitaras and that he was the son of Georgios and Maria Spanos Sitaras; that he was born in Chester, Pennsylvania, in 1919; that he was baptized in Philadelphia in 1920; that when he was four or five years old, his parents sent him to Greece because he was sick, and that he grew up in Greece, reared by his grandfather there. In explaining his reason for using the name "Kostatos" as a crewman, he stated that he had to show a military discharge to get employment on the ship. He asserted that he had had no military service and that he used the papers of a friend named Kostatos. Following his testimony, the hearing was adjourned.

The hearings were resumed in Philadelphia on April 24, 1952, before a different Deportation Examiner, the purpose of that hearing being the taking of depositions of certain people who resided in Pennsylvania and who appeared in Philadelphia as witnesses for Kostatos.

On June 16, 1952, a third hearing was held in Baltimore, at which the same John V. Carney presided and administered the oaths, his formal title this time being that of "Hearing Officer". The defendant called as a witness Eleftherios Sitaras, also known as Louis

Sitaras.[1] This witness testified that he was an American citizen but that he was born in Greece, where he lived until he was eleven years old. He said that, while in Greece, he attended school with Kostatos and he gave testimony to bolster his identification of Kostatos as John Sitaras.

The indictment here was returned on August 21, 1956. Previously, the defendant and five others, including Kostatos and Sitaras (of Pennslyvania), were indicted in the Eastern District of Pennsylvania and charged in two counts with conspiring to make false, fictitious and fraudulent statements to officers of the INS, and with conspiring to defraud the United States and the INS for the purpose of preventing the deportation of Georgios Kostatos.

Another indictment against the defendant in the Eastern District of Pennsylvania, charged him with subornation of perjury in connection with testimony of witnesses, including Louis Sitaras (of Pennsylvania), at the Philadelphia hearing. The defendant, after the trial in the United States District Court for the Eastern District of Pennsylvania, was convicted upon his plea of nolo contendere on the first count of the conspiracy indictment, sentenced to pay a fine and to imprisonment for two months. On motion of the United States Attorney, the second count of the conspiracy indictment and the indictment charging subornation of perjury were dismissed.

At the trial of the defendant in the Maryland District Court, Kostatos repudiated his former statements and admitted his identity, testifying that he was born in Greece and that the defendant had told him to claim to be John George Sitaras. The evidence disclosed that John George Sitaras, an American citizen, had been dead for several years, a fact known to the defendant.

---

1. Two men in this case are known as Louis Sitaras. One lives in Marcus Hook, Pennsylvania, and testified at the Philadelphia hearing but not in Baltimore.

The one to which reference is here made lives in Baltimore and testified at the second Baltimore hearing but did not testify in Philadelphia.

■ One of the questions for determination here arises because of the lower court's refusal to dismiss the Maryland indictment, the defendant urging that a trial on the Maryland indictment would place defendant Petite in double jeopardy because of the prior proceedings in the Eastern District of Pennsylvania in violation of the Fifth Amendment to the Constitution of the United States. Chief Judge Thomsen, of the District Court of Maryland, rendered his well-considered and able decision, United States v. Petite, 147 F.Supp. 791, 794, holding that "No double jeopardy has been shown". We approve the decision as reported.

■ In asserting that the District Court erred in denying the claim of double jeopardy, counsel for the defendant point to several decisions of the Supreme Court of the United States involving double jeopardy, including Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; United States v. Bayer, 1947, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654; Gore v. United States, 1958, 357 U.S. 386, 78 S. Ct. 1280, 2 L.Ed.2d 1405; Hoag v. State of New Jersey, 1958, 356 U.S. 464, 78 S. Ct. 829, 2 L.Ed.2d 913; and Ciucci v. State of Illinois, 1958, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983. These cited decisions were by a divided court, and counsel for the defendant persistently urged this court to disregard the majority opinions in these cases and to follow the dissenters. This court is bound by the decisions of the Supreme Court whether rendered by the full court or a divided court.

■ The defendant next points to the statutes defining perjury and suborna-tion of perjury.[2] He contends that the Immigration Act of 1917, Sec. 16, 39 Stat. 874, 885, 8 U.S.C. Sec. 152 *, provided for physical and mental examination of aliens coming into the United States, and although Immigrant Inspectors were authorized to make the examination and to administer an oath in so doing, that section was limited in its effect to persons just entering the country. He argues: That Section 17 of the same Act, 39 Stat. 874, 887, 8 U.S.C. § 153, ** provided for boards of special inquiry as to immigrants who had just come into the country and were detained at the port, such boards "appointed by the commissioner of immigration or inspector in charge at the various ports of arrival as may be necessary for the prompt determination of all cases of immigrants detained at such ports under the provisions of the law"; that Section 17 has no application here where the immigrant Kostatos had already entered the country, was employed herein and was claiming a right to remain here as a citizen by birth; that nowhere in that section was there a provision for the administration of an oath; that this is not a case "in which a law of the United States authorizes an oath to be administered" as contemplated by the perjury statute; that, consequently, neither Kostatos nor Eleftherios Sitaras committed the crime of perjury and, absent perjury, the conviction of the offense of subornation of perjury can not be sustained.

Since a decision on this question would be of no small import, it is deemed necessary to set forth the pertinent legislative history of the immigration laws at some length. The Immigration Act of 1917

---

2. Title 18 U.S.C. § 1621, 62 Stat. 773:
  "Perjury generally.
  "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, repose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury * * *."
  Title 18 U.S.C. § 1622, 62 Stat. 774:
  "Subornation of Perjury.
  "Whoever procures another to commit any perjury is guilty of subornation of perjury * * *."

* Now 8 U.S.C.A. § 1224.

** Now 8 U.S.C.A. § 1226.

was a comprehensive statute which revised and codified all previous laws respecting the immigration, exclusion and deportation of aliens. The Secretary of Labor, aided by the Commissioner General of Immigration,[3] administered the Act, and the latter, under the direction of the former, was vested with broad powers in the formulation of rules and regulations. Section 23 † declared "That the Commissioner General of Immigration shall perform all his duties under the direction of the Secretary of Labor. Under such direction he shall have charge of the administration of all laws relating to the immigration of aliens into the United States, and shall have the control, direction, and supervision of all officers, clerks, and employees appointed thereunder; he shall establish such rules and regulations, prescribe such forms of bonds, reports, entries, and other papers, and shall issue from time to time such instructions not inconsistent with law, as he shall deem best calculated for carrying out the provisions of this Act * * ". 39 Stat. 874, 892.

Pursuant to the rule-making authority granted by Section 23 of the 1917 Act, a system of regulations for the conduct of deportation hearings was promulgated. A brief summary of these regulations and the practice followed under them may be found in the opinion of the Court in Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 45, 70 S.Ct. 445, 94 L.Ed. 616.

In an effort to standardize administrative practice, Congress enacted the Administrative Procedure Act in 1946 (5 U.S.C.A. § 1001 et seq.; 60 Stat. 237). This Act sets forth the basic formalities to be followed in every case of adjudication required by statute (5 U.S.C.A. § 1004; Sec. 5 of the A.P.A.). The function and authority of officers presiding at the hearings, together with such other matters as the burden of proof, the right to cross examination, and the components of the record for decision, are detailed in Sec. 7 (5 U.S.C.A. § 1006). Among those things mentioned as within the powers of a presiding officer is the authority to "administer oaths and affirmations". Section 8 prescribes the steps to be taken in the rendering of the initial decision by the presiding officer and the review of it by the agency (5 U.S.C.A. § 1007).

The immigration authorities, in disregard of the A.P.A., continued to conduct their deportation hearings in accordance with the regulations promulgated by the Commissioner of Immigration. However, the Supreme Court in Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616, held that deportation hearings were subject to the provisions of the A.P.A. Sung, an alien seaman who overstayed his shore leave, was ordered deported. Having exhausted his administrative remedies, he applied to the District Court for the District of Columbia for habeas corpus, raising, as his sole ground, the objection that the administrative hearing had not been conducted in conformity with the A.P.A. The Supreme Court, in reversing the District Court and the Court of Appeals, held invalid the hearing conducted pursuant to the Immigration Commissioner's regulations.

As a result of the decision in the Sung case, Congress on September 27, 1950, declared that "Proceedings under law re-

---

3. In 1940, the administration of the Immigration Act was transferred from the Secretary of Labor to the Attorney General. In 1933, by Executive Order No. 6166 (5 U.S.C.A., Cum.Supp.), 5 U.S.C.A. § 132 note, the Bureau of Immigration was consolidated with the Bureau of Naturalization, the combined organization being known as the Immigration and Naturalization Service. The new organization was headed by an officer designated as the Commissioner of Immigration and Naturalization who acceded to the duties and authority previously possessed by the Commissioner General of Immigration. Accordingly, the new title of the new officer was substituted for the old one in the statute giving the power to make rules and regulations. 8 U.S.C.A. (1952 Ed.), Sec. 222, now 8 U.S.C.A. § 1103(a).

† Now 8 U.S.C.A. § 1103(a).

lating to the exclusion or expulsion of aliens shall hereafter be without regard to the provisions of sections 5, 7, and 8 of the Administrative Procedure Act (5 U.S.C.A. 1004, 1006, 1007)", 64 Stat. 1048. The purpose and effect of this statute was to restore the practice which had existed prior to the Sung decision.

The Commissioner of Immigration and Naturalization, with the approval of the Attorney General, issued amended regulations governing deportation hearings on November 8, 1950. 15 Fed.Reg. 7636 (1950). Provision was made in the amended regulations for the conduct of hearings, and the officer assigned to conduct the hearings was authorized to "administer oaths and affirmations". Moreover, heading the list of the hearing officer's specific duties was the direction that, "At the commencement of the hearing under the warrant of arrest, the hearing officer shall (1) place the alien under oath or affirmation * * ".

The defendant has cited Wong Yang Sung v. McGrath, supra, in support of his argument that deportation hearings are governed by the provisions of the Administrative Procedure Act and it is true that this case did so hold, but by the subsequent action of Congress in 1950, the Administrative Procedure Act did not thereafter apply to proceedings relating to the exclusion or expulsion of aliens. However, the Sung case is important here for another pertinent reason. There, in the course of its argument, the government had called attention to the qualifying language of Section 5 of the A.P.A., i. e., that the A.P.A. was applicable "in every case of adjudication required by statute * * * ", noting that there was no express requirement for any hearing or adjudication in the deportation sections of the Immigration Act of 1917. The government contended that this omission from the 1917 Act rendered the hearing provisions of the A.P.A. inapplicable. Mr. Justice Jackson, speaking for the Court (339 U. S., at page 49, 70 S.Ct. at page 454), replied that " * * * the difficulty with any argument premised on the proposi-

tion that the deportation statute does not require a hearing is that, without such hearing, there would be no constitutional authority for deportation. The constitutional requirement of procedural due process of law derives from the same source as Congress' power to legislate and, where applicable, permeates every valid enactment of that body". We conclude that one effect of the decision is to read into the Immigration Act of 1917 a constitutional requirement that the Immigration and Naturalization Service conduct hearings in deportation cases.

It seems beyond any serious challenge that the regulations promulgated by the Commissioner of Immigration and Naturalization on November 8, 1950, were pursuant to statutory authority. As we have seen, the Supreme Court held in the Sung case that the 1917 Immigration Act required *some* hearing before deportation could be permitted; Congress had removed deportation hearings from the operation of the Administrative Procedure Act, in effect restoring them to their previous status to be operated pursuant to the Commissioner's regulations; and, finally, the Commissioner of Immigration and Naturalization possessed the broad power under Section 23 of the 1917 Act, to issue the regulations setting forth the procedure for the necessary deportation hearing. John V. Carney, who administered the oath to the perjuring witness and who did not participate in the investigation preceding the hearing, was designated by the Immigration and Naturalization Service, pursuant to regulations, as an officer to conduct deportation hearings and administer oaths in that connection. Thus, the argument that the hearings in question were not authorized by law, and that the hearing provisions of the Administrative Procedure Act were applicable and were violated, is without basis in law.

It has been decided that a charge of perjury may be based upon false statements given at a hearing held pursuant to administrative regulations. In the language of Mr. Justice Whitaker, speaking for the Court in United States v.

Hvass, 1958, 355 U.S. 570, 575, 78 S.Ct. 501, 504, 2 L.Ed.2d 496, "The phrase 'a law of the United States,' as used in the perjury statute, is not limited to statutes, but includes as well Rules and Regulations which have been lawfully authorized and have a clear legislative base". See also 3 Wharton Criminal Law (Anderson Ed. 1957), Sec. 1318, page 685; United States v. Smull, 1915, 236 U.S. 405, 35 S.Ct. 349, 59 L.Ed. 641; United States v. Morehead, 1917, 243 U.S. 607, 37 S.Ct. 458, 61 L.Ed. 926.

■ The defendant charges error in failing to direct a verdict in his favor on the ground that the Government did not produce sufficient evidence to prove the essential elements of the crime of subornation of perjury. These elements are concisely stated as follows:

> "Subornation of perjury consists in procuring or instigating another to commit the crime of perjury."
>
> \*  \*  .  \*  \*  \*  \*
>
> "It is essential to subornation of perjury that the suborner should have known or believed or have had good reason to believe that the testimony given would be false; that he should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and that he should have knowingly and willfully induced or procured the witness to give such false testimony."

70 C.J.S. 1951 Perjury § 79.

Bearing in mind the essentials of the crime, we turn to consideration of the Government's burden of proof, particularly the need for corroborative evidence under the so-called "two witness rule" and the "accomplice rule".

■ Since proof that perjury was actually committed is a necessary element of subornation, the perjury must be established in the same manner as when the perjurer himself is tried. This means that the falsity of the testimony must be proven by the evidence of two witnesses, or by one witness supported by proof of corroborating circumstances.

See Hammer v. United States, 1926, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118; Weiler v. United States, 1945, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495; Goins v. United States, 4 Cir., 1938, 99 F.2d 147; 41 Am.Jur., "Perjury", Sec. 67, p. 37. As to the procurement or inducement, however, this element of the crime of subornation need not be so corroborated. Catrino v. United States, 9 Cir., 1949, 176 F.2d 884, 888, 41 Am.Jur., "Perjury", Sec. 78, p. 43; Culwell v. United States, 5 Cir., 1952, 194 F.2d 808, 812; Doan v. United States, 9 Cir., 1953, 202 F.2d 674.

■ The general rule that one may not be convicted on the uncorroborated testimony of an accomplice does not apply to procuring or inducing the perjury, as the suborner and the suborned are not accomplices:

> " \*  \*  \*  (S)o far as the rule requiring corroboration of the evidence of an accomplice is concerned as applied to the testimony of the suborned in prosecutions for subornation of perjury, the suborner and suborned are accomplices as regards the perjury itself, but as to other elements of the crime, such as procuring or inducing the perjury, they are not accomplices, \*  \*  \*." 41 Am.Jur., "Perjury", Sec. 79, p. 44.

■ Viewing the evidence in the light most favorable to the Government, as this Court is obliged to do here (Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, the burden of proof has been met and the elements of the crime have been established. The falsity of Kostatos' testimony that he was an American, and of Eleftherios Sitaras' identification of him as an American, was well corroborated. Not only did Kostatos and Eleftherios Sitaras themselves admit their perjury, but the manifest of the S. S. Santa Irene was convincing evidence that Kostatos was a Greek seaman and not an American. In addition, the Government fully established by the testimony of one Mike Sitaras, a witness who had refused

to join the scheme and who did not testify at any of the hearings, that the real John George Sitaras, the man whose identity Kostatos assumed, had been dead for almost thirty years. As to the procurement of the perjury, the testimony of Kostatos was, of itself, sufficient to convict. In addition, it was bolstered and corroborated by the witness, Mike Sitaras, who testified that he was requested by the defendant to join in the effort to substitute the identity and name of the deceased John George Sitaras for that of Kostatos.

Defendant points to Eleftherios Sitaras' testimony in which he admitted that he lied for Kostatos, and argues that this testimony shows that it was not the defendant who procured Eleftherios Sitaras' perjury, but this argument is without merit. It is true that, after detailing conversations with the defendant in which this witness, Sitaras, claimed that the defendant had pleaded with him to swear that Kostatos was John George Sitaras, this same witness admitted, on cross-examination, that he refused defendant's request to testify falsely at the deportation hearing but did so because of the pleas of Kostatos himself. But his testimony shows that it was the defendant who brought him to the hearing at which he testified; that defendant told him what he should say about Kostatos, placed him on the witness stand and asked the predetermined questions calculated to elicit the testimony which the witness knew to be false.

Defendant alleges error in portions of the Court's charge to the jury: (1) reference to the trial of the defendant and others in Philadelphia, the defendants' plea of nolo contendere and the explanation of the effect of such plea; (2) the statement that "Mr. Petite is still practicing law in Baltimore at this time"; and (3) the instruction given in response to a written question addressed to the Court by the jury—"Does knowledge of how a witness will testify without actually having instructed him to so say make the defendant guilty?"

As to (1) above, it appears from the record that the fact that the defendant had been tried in Philadelphia was injected into this case by the defense after a warning by the Court and after defense counsel answered, "We'll take that chance, Your Honor". In fact, defense counsel used the Philadelphia trial as the basis of his argument to the jury that his client was being persecuted. Following the delivery of the charge, defendant's attorney said that he had "nothing much of an exception", but that he was not in complete agreement as to the Judge's interpretation of *nolo contendere*. The Judge replied, "If I haven't made that clear, I will be glad to do it, if you will tell me how I should make that clear". Defense counsel declined the offer and stated, "We'll leave it that way. All right". Again the Judge said, "I will be glad to give them any further instructions if you want me to on that point". The final reply was, "No, I won't urge anything more on that, Sir". Certainly the defendant cannot be heard to say that he thus effectively objected. As this Court recently said in Finn v. United States, 4 Cir., 1958, 256 F.2d 304, 308: "In the absence of objection at the trial, a claimed error in the charge will be noticed on appeal only in unusual circumstances * * *". Such circumstances are not present here.

As to (2) above, the explanation of the Court's remark is quite simple and the reason well known to defense counsel. One of the jurors met the Judge's law clerk in the courthouse elevator following testimony as to the defendant's good character as a lawyer and inquired whether the defendant was still practicing law. The law clerk did not answer the question and properly reported the incident to the Judge. At the close of the evidence and before argument, the Judge called counsel to the bench and advised them of the conversation between juror and law clerk, stating, "I am telling counsel for both sides this so that they may know that that question was in the juror's mind and they

can pitch their arguments accordingly. If it is mentioned by either counsel in the argument, I think that along with the definition of nolo contendere that I will give to the jury, that I should state as a fact that Mr. Petite is still practicing law". Defense counsel made no objection to the Judge's suggestion, gave no hint that it would not meet with his approval, and neither made objection nor took exception following the delivery of the charge. See Finn v. United States, supra.

■■■ As to (3) above, in answering the question the Court told the jury:

"Now, let me break it down. Knowledge of how the witness will testify does not make a defendant guilty. On the other hand, a defendant may be guilty without having instructed the witness what to say.

"A lawyer may be guilty of subornation of perjury even though he has not instructed the witness to say so if he knows that the testimony the witness is going to give is false and if he knows that the witness knows that it is false and yet he causes or induces the witness to do it and puts the witness on the stand, and the witness does so testify; then the defendant may be guilty.

"But mere knowledge of how the witness will testify is not of itself sufficient to make him guilty. He must, within the language I gave you, cause or induce.

"Is that clear?

"That is, mere knowledge of how the witness will testify is not enough. On the other hand, the Government does not have to prove that he instructed him how he should testify.

"It is enough if the lawyer, the defendant, in this case, knows that the testimony that the witness is going to give is not true and knows that the witness knows it, and still puts him on the stand to give it and causes and induces him to do it."

Defense counsel excepted, explaining in the following language:

"I mean the answer to the Foreman's question, I feel it should be, that it is only subornation of perjury when the person who is charged with subornation of perjury causes, induces or instructs the person to so testify.

"Mere knowing that the person has testified or would testify unlawfully or commit perjury is not subornation of perjury."

However, throughout the Judge's charge he defined subornation of perjury as the procuring of perjured testimony. He referred to "the alleged inducement by the defendant of the witnesses to commit perjury" and he instructed that "To procure and to suborn, means to contrive or to induce, to instigate. That is what we mean by procuring or suborning * * *. It is a question of whether the defendant did it and whether he did it knowingly and wilfully". The jury was told:

"The principal dispute in the case is whether or not on the one hand George Kostatos saw the defendant, George Petite, before he was arrested, and if so, whether they agreed upon the story that George Kostatos was to tell knowing it to be false, and that George Petite assisted in arranging for others to support that story knowing it to be false; or on the other hand whether George Kostatos made up the story himself and did not see George Petite until after he had told the story once to the Immigration and Naturalization Service when he made the statement on October 23rd and that he deceived Petite into believing that it was true.

Viewing the charge as a whole, and looking at the entire answer to the jury's question, the conclusion is inescapable that the jury received an accurate, complete and impartial explanation of the necessary elements of the crime of subornation of perjury and could not have been misled or confused thereby to the defendant's prejudice.

Certain assignments of error in the admission of evidence are based upon the defense theory and argument that nei-

ther the deportation hearing of February 14, 1952, nor June 16, 1952, was a proper "judicial proceeding" and that the oath was not taken before a competent tribunal in a case in which a law of the United States authorizes an oath to be administered. Having reached a decision contrary to this theory, these alleged errors need no further discussion.

The defendant charges other errors in the admission and exclusion of evidence which were noted in his brief but not emphasized in oral argument. However, they have been reviewed and considered and, perceiving no prejudicial error, we deem it unnecessary to burden this already lengthy opinion with additional comments.

For the reasons stated herein, the conviction of the defendant on two counts of subornation of perjury is

Affirmed.