**RAILWAY EXPRESS AGENCY, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

**Air Freight Forwarders Association, American Airlines, Inc., United Air Lines, Inc. and Trans World Airlines, Inc., Intervenors.**

No. 18868.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 15, 1965.

Decided March 18, 1965.

Petition for Rehearing Denied
April 26, 1965.

Mr. William Q. Keenan, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. John E. Powell, Washington, D. C., was on the brief, for petitioner.

Mr. O. D. Ozment, Associate General Counsel, Litigation and Legislation, Civil Aeronautics Board, with whom Asst. Atty. Gen. William H. Orrick, Jr., and Messrs. John H. Wanner, General Counsel, Joseph B. Goldman, Deputy General Counsel, and Robert L. Toomey, Attorney, Civil Aeronautics Board, and Lionel Kestenbaum, Attorney, Department of Justice, were on the brief, for respondent.

Mr. Louis P. Haffer, Washington, D. C., for intervenor Air Freight Forwarders Ass'n.

Mr. Gordon W. Bickert, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Warren E. Baker and Joseph F. Healy, Jr., Washington, D. C., were on the brief for intervenor Trans World Airlines, Inc., argued for intervenors Trans World Airlines, Inc., American Airlines, Inc. and United Air Lines, Inc.

Messrs. Robert L. Stern, Chicago, Ill., and James Francis Reilly, Washington, D. C., were on the brief for intervenor United Air Lines, Inc.

Mr. Alfred V. J. Prather, Washington, D. C., was on the brief for intervenor American Airlines, Inc.

Before BAZELON, Chief Judge, and FAHY and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge:

By its Order No. E-20332, the Civil Aeronautics Board disapproved certain agreements entered into between the Railway Express Agency, Inc. (REA) and various airlines.[1] Under each agreement the airline promised to carry, between

---

1. The airlines involved were Alaska Airlines, Inc., Eastern Airlines, Inc., The Flying Tiger Line Inc., Pan American World Airways, Inc., Riddle Airlines, Inc., Slick Corporation, and Transportation Corporation of America. The agreements had been submitted by the airlines for approval under § 412 of the Federal Aviation Act of 1958, 72 STAT. 770, 49 U.S.C. § 1382, which provides in pertinent part:

"(a) Every air carrier shall file with the Board a true copy * * * of every contract or agreement * * * affecting air transportation * * * between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning

specified points, cargo "presently moving in the services of [REA]" to the extent the airline determined it had space available. The parties agreed that the airline should receive a fixed amount for each 100 pounds of cargo carried[2] and that REA would receive "the balance of the charges collected from the public." REA was to issue to the shipper its Uniform Express Receipt, on which it assumed responsibility to the shipper for the entire transportation, but the agreement provided that, as between themselves, each party would bear liability for damages occurring during its carriage of the shipment.

REA contended before the Board that the agreements were simply contracts between itself (a surface carrier subject to regulation by the Interstate Commerce Commission) and a specific air carrier for through service and joint rates, and that such contracts were clearly authorized under Section 1003 of the Federal Aviation Act.[3] The Board concluded,

earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for *regulating stops, schedules, and character of service*, or for other cooperative working arrangements.

"(b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this chapter * * *."

2. The Board found that in the Alaska Airlines and the Flying Tiger Line agreements the rate charged by the airline was equal to or less than the local deferred freight rate regularly charged by the airline.

3. Section 1003, 72 STAT. 791, 49 U.S.C. § 1483, provides:

"(a) The Board and the Interstate Commerce Commission shall direct their respective chairmen to designate, from time to time, a like number of members of each to act as a joint board to consider and pass upon matters referred to such board as provided in subsection (c) of this section.

"(b) Air carriers may establish reasonable through service and joint rates, fares, and charges with other common carriers; except that with respect to transportation of property, air carriers not directly engaged in the operation of aircraft in air transportation (other than companies engaged in the air express business) may not establish joint rates or charges, under the provisions of this subsection, with common carriers subject to the Interstate Commerce Act. In case of through service by air carriers and common carriers subject to the Interstate Commerce Act, it shall be the duty of the carriers parties thereto to establish just and reasonable rates, fares, or charges and just and reasonable classifications, rules, regulations, and practices affecting such rates, fares, or charges, or the value of the service thereunder, and if joint rates, fares, or charges shall have been established with respect to such through service, just, reasonable, and equitable divisions of such joint rates, fares, or charges as between the carriers participating therein. Any air carrier, and any common carrier subject to the Interstate Commerce Act, which is participating in such through service and joint rates, fares, or charges, shall include in its tariffs, filed with the Civil Aeronautics Board or the Interstate Commerce Commission, as the case may be, a statement showing such through service and joint rates, fares, or charges.

"(c) Matters relating to such through service and joint rates, fares, or charges may be referred by the Board or the Interstate Commerce Commission, upon complaint or upon its own initiative, to a joint board created as provided in subsection (a) of this section. Complaints may be made to the Interstate Commerce Commission or the Board with respect to any matter which may be referred to a joint board under this subsection.

"(d) With respect to matters referred to any joint board as provided in subsection (c) of this section, if such board finds, after notice and hearing, that any such joint rate, fare, or charge, or classification, rule, regulation, or practice, affecting such joint rate, fare, or charge or the value of the service thereunder is or will be unjust, unreasonable, unjustly discrim-

however, that the operations of REA under the proposed agreements would not be those of a joint carrier of through traffic, but rather that the agreements called for REA to undertake indirectly to engage in air transportation—an undertaking which requires Board authorization not presently held by REA.[4] The Board's conclusion was based on its finding that, as contemplated by the parties to each agreement, REA would be responsible to the shipper for the entire transportation and could charge the shipper a rate having no relation to the rate payable to the airline. The Board found, moreover, that REA would determine whether or not to ship any particular shipment by air and, if so and a choice of airline existed, REA could determine which airline to use. In short, the Board found that REA would be engaged in selling air transportation to the public. Since REA has no authority so to do, the agreements were held to violate the Federal Aviation Act and, hence, under Section 412, were not entitled to Board approval.

REA petitioned the Board for reconsideration and, in addition, requested that the Board refer the case to a joint board appointed under Section 1003 or, in the alternative, that the Board grant REA a hearing. The Board denied these requests and refused to reconsider its order. REA now petitions for review of the actions of the Board.[5]

The Federal Aviation Act permits engagement in air transportation, whether direct or indirect, only by persons who hold a certificate of public convenience and necessity issued by the Civil Aeronautics Board,[6] or who have been exempted from the provisions of the Act.[7] The Board has defined an "indirect air carrier" as one who "holds out to the public that it will undertake to transport property by air, and enters into contracts with shippers wherein it binds itself to discharge such an undertaking with respect to particular shipments." [8] In this case the Board found, upon substantial evidence, most of which was submitted by REA at the Board's invitation, that REA's operations under the proposed agreements would constitute indi-

---

inatory, or unduly preferential or prejudicial, or that any division of any such joint rate, fare, or charge, is or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto, it is authorized and directed to take the same action with respect thereto as the Board is empowered to take with respect to any joint rate, fare, or charge, between air carriers, or any divisions thereof, or any classification, rule, regulation, or practice affecting such joint rate, fare, or charge or the value of the service thereunder.

"(e) Orders of the joint boards shall be enforceable and reviewable as provided in this chapter with respect to orders of the Board."

4. Section 401(a) 72 Stat. 754, 49 U.S.C. § 1371(a), provides:

"No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation."

The term "air carrier" is defined in § 101(3), 72 Stat. 737, 49 U.S.C. § 1301 (3), as follows:

"'Air carrier' means any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation * * *."

5. Jurisdiction in this court is based on Section 1006 of the Federal Aviation Act, 72 Stat. 795, 49 U.S.C. § 1486.

6. See Note 4, *supra.*

7. Under Section 101(3) of the Federal Aviation Act, 49 U.S.C. § 1301(3), the Board may grant an indirect air carrier an exemption "from the provisions of this chapter to the extent and for such periods as may be in the public interest." See American Air lines v. Civil Aeronautics Board, 7 Cir., 178 F.2d 903 (1949).

8. Railway Express Agency, Grandfather Certificate, 2 C.A.B. 531, 536 (1941). See also Consolidated Flower Shipments–Bay Area v. Civil Aeronautics Bd., 9 Cir., 213 F.2d 814 (1954); National Air Freight Forward. Corp. v. Civil Aero. Bd., 90 U.S.App.D.C. 330, 331–332, 197 F.2d 384, 385–386 (1952); American Airlines v. Civil Aeronautics Board, *supra* Note 7; Intra-Mar Ship-

rect air carriage.[9] Since REA is not authorized to carry on such operations, approval of the agreements was properly withheld.

The case would end here were it not for REA's contention that in the situation presented here Section 1003 of the Federal Aviation Act overrides the requirement that indirect carriers be either certificated under Section 401 or exempted under Section 101(3). In essence, REA contends that when a surface carrier contracts with a direct air carrier and the contract calls for the surface carrier to operate as an indirect air carrier, the requirement for Board authorization differs from what it would be if no surface carrier were involved. This difference arises, according to REA, because of the provisions in Section 1003 which authorize air carriers to "establish reasonable through service and joint rates, fares, and charges with other common carriers" and which provide procedures for regulation of the rates, charges, and practices of carriers operating under through service arrangements. Under REA's theory, all transportation in which the cargo is carried part way by surface carrier and part way by air must be regulated by a joint board convened according to Section 1003(a).

■■ Such a construction, however, is not consistent with the regulatory system ordained by Congress. Under the Federal Aviation Act, the Board is given exclusive authority and responsibility for the economic regulation of the air transportation industry, as therein defined. No one is permitted to engage in air transportation, either directly or indirectly, without Board authorization, either in the form of a certificate or, in the case of indirect carriers, possibly by exemption. Section 1003 is not designed to create an exception to the Board's responsibility in those cases where a surface carrier engages in operations which the Act includes in its definition of "air transportation." That section merely provides a procedure for regulation of rates and practices in cases where an air carrier arranges with a surface carrier for through transportation service. When such an arrangement is made, and each participating carrier is operating within the proper scope of its authority, Section 1003 provides a method which may be invoked by either the Board or the Interstate Commerce Commission for regulating the participating carriers. But when, as in this case, an arrangement for through service calls for the surface carrier to perform operations which require permission from the Board, the surface carrier is not relieved of the necessity of obtaining such permission.

■ Adoption of the statutory construction urged by REA would give Section 1003 an effect which could hardly have been intended by Congress. At present, the operation of assembling packages for air shipment is performed largely by concerns known as air freight forwarders.[10] These concerns are exten-

---

ping, Enforcement Proceeding, 27 C.A.B. 568 (1958).

The Board's definition of this statutory term is entitled to the deference usually accorded to statutory interpretations given by the agency charged with the administration of the statute. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 800 (1965); Unemployment Compensation Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 1136 (1946).

9. Under well settled principles of judicial review of administrative action, Board findings supported by the record are conclusive. 49 U.S.C. § 1486(e); N. L. R. B. v. Hearst Publications, Inc., 322

U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

10. An "air freight forwarder" is defined as one who "in the ordinary and usual course of its undertaking, assembles and consolidates or provides for assembling and consolidating of property or performs or provides for the performance of break-bulk and distributing operations with respect to consolidated shipments, or both, is responsible for the transportation of such property from the point of receipt to point of destination, and utilizes for the whole or any part of such transportation the services of a direct air carrier." 14 C.F.R. § 297.2 (1964).

sively regulated by the Board.[11] In the past REA has sought authority from the Board to operate as an air freight forwarder.[12] The Board has refused such authority because it felt that the impact of REA's entry into the industry would have effects harmful to the public.[13] However, it is now argued that Section 1003 permits REA to engage in operations which the Board has held to be not in the public interest. We cannot agree that Section 1003 has the effect of allowing REA's entry, without Board approval, into an industry expressly committed by Congress to the exclusive regulatory power of the Board.[14]

■ REA also contends that the Board erred in denying its request for a hearing. This request was made at the same time REA petitioned for reconsideration of the Board's order disapproving the

agreements. The Board had previously invited REA to submit any relevant information. REA has done this, and it was on this information that the Board based its order.

■ Section 412 contains no requirement for a hearing in contract approval proceedings. Nevertheless, REA contends that it is entitled to a hearing as a matter of due process.[15] But due process does not require that every administrative action be preceded by a hearing. The underlying facts of REA's operations under the proposed agreements were not disputed. The Board accepted as true the information submitted by REA. The only issues before the Board involved the legal consequences of those facts. Under such circumstances, a hearing is not required.[16]

Affirmed.

11. The Board's regulations concerning air freight forwarders appear at 14 C.F.R. Parts 296 and 297 (1964).

12. See Railway Express, Airfreight Forwarder Application, 27 C.A.B. 500 (1958); and cf. Railway Exress Agency, Inc., and Northwest Airlines, Inc., Agreement, 9 C.A.B. 905 (1948).

13. Railway Express, Airfreight Forwarder Application, supra Note 12 at 537–538. Another reason for the Board's refusal is the fact that REA is controlled by railroads. See Section 408 of the Federal Aviation Act, 72 STAT. 767, 49 U.S.C. § 1378; Railway Express, Airfreight Forwarder Application, supra Note 12 at 502–504. Cf. National Air

Freight Forward. Corp. v. Civil Aero. Bd., supra Note 8.

14. We find nothing in the legislative history of Section 1003 to warrant the conclusion that the section was intended to provide any exceptions to the broad provision in Section 401. See H.R.Rep. No. 2254, 75th Cong., 3d Sess., p. 8 (1938).

15. Cf. Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950); The Japanese Immigrant Case [Yamataya v. Fisher], 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903).

16. Mississippi River Fuel Corp. v. Federal Power Com'n, 108 U.S.App.D.C. 284, 292, 281 F.2d 919, 927 (1960), cert. denied, 365 U.S. 827, 81 S.Ct. 712, 5 L.Ed.2d 705 (1961).