**FUGAZY TRAVEL BUREAU, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent.

No. 18946.

United States Court of Appeals
District of Columbia Circuit.

Argued April 30, 1965.

Decided June 18, 1965.

Petition for Rehearing En Banc
Denied Oct. 5, 1965.

Mr. Paul Reiber, Washington, D. C., for petitioner.

Mr. Frederic D. Houghteling, Atty., Civil Aeronautics Board, with whom Asst. Atty. Gen. William H. Orrick, Jr., Messrs. John H. Wanner, Gen. Counsel, Civil Aeronautics Board, Joseph B. Goldman, Deputy Gen. Counsel, O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, Civil Aeronautics Board, and Lionel Kestenbaum, Atty., Dept. of Justice, were on the brief for respondent.

Before WASHINGTON, Circuit Judge, BASTIAN, Senior Circuit Judge, and TAMM, Circuit Judge.

TAMM, Circuit Judge.

Petitioner seeks review of two orders of the Civil Aeronautics Board. The first of these (Order No. E–20741, dated April 24, 1964) held a certain agreement among the scheduled airlines of the United States, known as the "Standard Agent's Ticket and Area Settlement Plan," to be not adverse to the public interest and, accordingly approved said agreement under section 412 of the Federal Aviation Act.[1]

The second order (Order No. E–21180, dated August 12, 1964) denied reconsideration of the first order.

Petitioner is a travel agent engaged in the sale, for a commission, of travel facilities. It now operates 23 offices in 21 locations. A travel agent, as the name implies, is an individual businessman who represents airlines, other common carriers, hotels, etc. in the sale of travel facilities and accommodations, and who is compensated by agreed commissions on the tickets and accommodations which the travel agent sells.

The several airlines, through their trade organization, which is known as the Air Traffic Conference of America (ATC), adopted and filed with the Civil Aeronautics Board in 1940 their first "ATC Agency Resolution;" in 1945, they adopted a new resolution and agreement, which was approved by the Civil Aeronautics Board and which has remained—with amendments—in force to the present time. The 1945 Agency Resolution provided for a minimum of four remittances a month by all ticket and travel agencies, a frequency of remittances which for most agents was decreased to two per month in 1948 and has remained at that figure since that time. In May, 1946, however, the Air Traffic Conference filed an amendment to the 1945 resolution which, when approved by the Civil Aeronautics Board, permitted individual airlines to contract with those travel agencies which they had appointed to represent them at ten or more approved locations for less frequent remittances. Still later amendments to the Agency Resolution placed a once-a-month minimum on the remittance frequency of large chain agencies, i. e., those having ten or more approved locations. These amendments also permitted airlines to allow these so-called large chain agencies an alternative of submitting remittances three times a month but under a program incorporating substantially longer grace periods in the remittance statements in order to accommodate the large agencies' centralized auditing and reporting systems. Petitioner's tenth approved loca-

1. POOLING AND OTHER
AGREEMENTS
Filing of Agreements Required
Sec. 412. [72 Stat. 770, 49 U.S.C. § 1382] (a) Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, op-

pressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.
Approval by Board
(b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this Act, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this Act; except that the Board may not approve any contract or agreement between an air carrier not directly engaged in the operation of aircraft in air transportation and a common carrier subject to the Interstate Commerce Act, as amended, governing the compensation to be received by such common carrier for transportation services performed by it.

tion was placed on the Air Traffic Conference Agency List in August 1959, thereby making it eligible for the once-a-month remittance privilege. In May, 1962, the domestic trunklines had all agreed, with the petitioner, for remittances on a monthly basis.

In 1962, the airlines proposed a program or "Plan" (as it is referred to in the record before us) which became the subject of the two Civil Aeronautics Board orders now under challenge in this proceeding. The Plan proposed to abolish the prior special treatment of large chain agencies and to require all agents to remit the proceeds of airline ticket sales on the same three-times-a-month basis. While the petitioner attacks fundamentally that portion of the Plan which abolishes its practice of remitting the proceeds of airline ticket sales once a month and requiring remittance three times a month, other aspects of the Plan require brief enumeration in order to present a full picture of the petitioner's status.

As presented by the airlines, the principal purposes of the Plan were (1) to allow travel agents to stock a single standard ticket for all domestic and some international air travel, instead of having to stock separate tickets for each appointing airline, as had been done theretofore; and (2) to provide for a single consolidated periodic report of and remittance for air ticket sales to a designated regional bank, instead of requiring separate reports and remittances to each appointing airline. The Plan, as presented by the airlines, was represented to the respondent as relieving travel agents from the necessity of maintaining separate ticket sequences, eliminating the use of auditors' coupons by the airlines at the end of the reporting period, and of computing the net amount to each airline. As a consequence of these provisions, the Plan required a central clearing house to check the travel agents' consolidated reports, to sort and distribute the auditors' coupons and to compute and credit the amount due each airline. The Plan proposed that these latter functions would be performed by a series of designated area banks which would perform the several accounting functions for a small service fee. In order to avoid undertaking the added expense of the service fee, which the airlines contended was being incurred primarily for the travel agents' benefit, the airlines proposed to recoup the bank service charges by shortening the time interval between the agents' sales of airline tickets and the time when they remitted the proceeds of those sales to the airlines. This was to be accomplished specifically by abolishing the special monthly remittance frequencies previously allowed the large travel agents and by requiring all travel agents to remit the proceeds of ticket sales to the airlines three times a month. The Plan also shortened the so-called grace period allowed the large agents for preparation and delivery of the reports following the end of each reporting period.

With some minor changes, the Plan, as outlined here above, was approved in the challenged orders by the Civil Aeronautics Board. It is to be observed at this point that the increased frequency of remittances by travel agents was, for practical purposes, a by-product of the over-all Plan.

After the Plan had been submitted to the Civil Aeronautics Board for approval, the American Society of Travel Agents (a trade organization representing primarily the smaller agents) filed adverse comments upon the Plan, as did a number of individual agents, including the petitioner. Generally, the comments consisted of criticism of the increased reporting and remittance frequencies, which were claimed to be burdensome and unnecessary. Petitioner specifically protested that the Plan took no account of its special problems centered around its centralized accounting procedures. The petitioner asserted, and here asserts, that due process and the *Standard Air-*

*lines* case[2] "required a formal hearing before the Board could approve the Plan."

The Air Traffic Conference filed rebuttal comments with the respondent attempting to support and justify the Plan and attacking the travel agents' adverse comments. At no time did the Civil Aeronautics Board hold a formal hearing, although members of the Board's staff met with representatives of the Air Traffic Conference on at least one occasion in what is described as an attempt on the part of the Board's staff members "to satisfy their doubts about the Plan." (Tr. 98). The Board reviewed all of the adverse and favorable comments and ultimately requested further comments from both the airlines and the travel agents; and such comments were filed by the Air Traffic Conference, by the petitioner, and by other travel agencies, both large and small. Petitioner continued to reiterate its contention that the Plan would drive it out of business and that it was entitled to an evidentiary hearing. After considering all comments, the Civil Aeronautics Board approved the Plan, with some modifications. The Board specifically found that the Plan was in the public interest (Tr. 247) and that it would be of significant practical benefit to both the airlines and the agents (Tr. 259–260). The Board also reviewed the petitioner's contention that it was entitled as a matter of law to an evidentiary hearing (Tr. 251–252), and the Board held that a hearing would serve no useful purpose, since the Board found there were no significant factual disputes requiring resolution. The Board specifical-

ly, in approving the Plan, approved the change requiring all travel agencies to remit the proceeds of airline ticket sales three times a month, and also it did lengthen the grace period by one working day. The Board also required that in order to meet the central accounting problems of large chain travel agencies those agencies should be allowed to remit on an estimated basis.

After approval of the Plan as amended, the petitioner sought reconsideration, and the Board's second order, heretofore described, denied that reconsideration— again reiterating its finding that the Plan was in the public interest and again rejecting the petitioner's contention that due process required affording to petitioner an evidentiary hearing.

Against this background, the petitioner challenges the Civil Aeronautics Board proceedings, contending first that since the petitioner is adversely affected by the described orders of the Board the petitioner was entitled to an adjudicatory hearing before the approval of the Plan by the Board. The petitioner also questioned the legality of the Board's approval of the Plan without the making of specific findings on questions relating to the restraint of competition and upon the element of transport needs.

The opinions of this court upholding the rights of adversely affected persons to a hearing before the administrative agency prior to adjudication by the agency of questions affecting their legal rights are so numerous as to negate the necessity for citation. It is essential, however, that the person demanding

2. Standard Airlines v. Civil Aeronautics Board, 85 U.S.App.D.C. 29, 177 F.2d 18 (1949). The present case differs from the *Standard Airlines* case basically because in the *Standard Airlines* case the Civil Aeronautics Board suspended Standard's letter of registration without a hearing but after a prehearing conference was held at which issues were framed and a hearing date set upon the issue of suspension. Moreover, in the *Standard Airlines* case, the action of the Civil Aeronautics Board "would destroy prop-

erty, not a license property but investment and business property." The action of the Board in the *Standard Airlines* case in suspending Standard's letter of registration resulted in the complete discontinuance of Standard's regular operational business activities. In the present case, as is pointed out in the opinion, the Board's action does not in any way limit, prohibit or curtail the present petitioner's privilege of conducting its own business.

a hearing has some legal status upon which to predicate his demand:

> "'Legal wrong,' as we have only recently noted, is the invasion of a legally protected right." Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 185, 334 F.2d 570, 575 (1964), as quoted with approval in Pennsylvania Railroad Company v. Dillon, 118 U.S. App.D.C. 257, 335 F.2d 292, 294 (1964).

This court has specifically pointed out that Section 412 of the Federal Aviation Act of 1958, contains no requirements for a hearing. Railway Express Agency, Inc. v. Civil Aeronautics Board, March 18, 1965, 120 U.S.App.D.C. ——, 345 F.2d 445. In the same case, this court held that no hearing is required as a matter of due process prior to the approval or disapproval of an agreement under this section of the statute. Ibid.

The Supreme Court in Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) points out that:

> "The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest. 'For, though "due process of law" generally implies and includes actor, reus, judex, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, * * * yet, this is not universally true.' Den, ex dem. Murray's Lessee v. Hoboken Land and Improvement Co., 18 How. 272, 280 [15 L.Ed. 372]. The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. Federal Communications Comm. v. WJR, 337 U.S. 265, 275–276 [69 S.Ct. 1097, 93 L.Ed. 1353]; Hannah v. Larche, 363 U.S. 420, 440, 442 [80 S.Ct. 1502, 4 L.Ed.2d 130]; Hagar v. Reclamation District No. 108, 111 U.S. 701, 708–709 [4 S.Ct. 663, 28 L.Ed. 569]. ' "[D]ue process," unlike some legal rules, is not

a technical conception with a fixed content unrelated to time, place and circumstances.' "

To the same import is the holding of the Court of Appeals for the Fifth Circuit where, in Dixon v. Alabama State Board of Education, 5 Cir. 294 F.2d 150, 155 (1961), the court quotes from Mr. Justice Frankfurter's concurring opinion in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 95 L.Ed. 817:

> "'Whether the *ex parte* procedure to which the petitioners were subjected duly observed "the rudiments of fair play", * * * cannot * * * be tested by mere generalities or sentiments abstractly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment.'"

Since the petitioner relies in its contentions for an evidentiary hearing before the Board upon both its rights to due process and the Administrative Procedure Act, it should be observed that even under the Administrative Procedure Act a claimant is required to establish that a legal right has been adversely affected by agency action.

To summarize the impact of the above-quoted decisions, it may be stated that in order to be entitled to a hearing, it must be shown that the claimant will be adversely affected in a legal or property right. What, then, is the petitioner's status in these proceedings? Petitioner is an agent of a substantial number of airlines under a standard sales agency agreement which petitioner voluntarily executed with the Air Traffic Conference as the representative of the airlines. The claimed "right" for which petitioner seeks constitutional protection

is its present privilege of holding the airlines' money and remitting it to them no more often than once a month, which arrangement grew out of the Sales Agency Agreement which the petitioner voluntarily executed with the Air Traffic Conference. This agreement expressly provides, however, that it may be terminated at will by the parties thereto, acting individually or collectively. The agreement also specifically provides that it is subject to the terms of the Air Traffic Conference Resolution as it is amended from time to time. It will be observed, then, that any or all of the airlines now represented by petitioner may at any time revoke the agency of the petitioner without violating any contractual right of the petitioner.

The Board's orders herein challenged do not affect the petitioner's status as a travel agent—in fact, the Civil Aeronautics Board does not license travel agents, nor does it regulate the contractual arrangements between individual airlines and such agents as they choose to employ or utilize. The petitioner's right to remain in the travel agent field and conduct its business is not impinged by the Board's orders. The petitioner retains its right to sell travel accommodations, including airline tickets, on credit if it so desires. This, however, is obviously the area of the petitioner's real complaint: as a result of the order effectuating the Plan, the petitioner must now furnish the capital for its own operations. Heretofore, petitioner has been able, because of the monthly remittance plan, to utilize proceeds collected from the sale of airline tickets for its own purposes until required to remit these funds to the airlines for which they were originally collected. Petitioner says that 90 percent of its business is done on a 30-day credit basis. Under the Plan approved by the Board's current order, the petitioner will have to obtain or supply additional capital to finance its own operations, rather than have them financed by the airlines' capital. Parenthetically, it

may be noted that the Board found the Plan would be beneficial to the airlines' cash flow.

It has been stated in argument of this case that there are from four to six thousand travel agents in the United States. The number of travel agents who had ten or more offices has not exceeded four during the 15-year period from 1948 to 1963. Petitioner states that when the Plan was filed with the Board in September 1962, "there may have been only one other travel agent which was using the 30-day remittance privilege." It follows, then, that all but one or two of the four to six thousand travel agents were then being required to make remittances twice a month, while the petitioner—and possibly one other agent—exercised a privilege of, or permission for, a once-a-month remittance. Petitioner describes this prior practice as establishing a "personal" right in the petitioner— that is, a right to require the petitioner's principals to leave their funds with it, as agent, for a longer period than those principals do with the more than 99 percent of the other agents who represent them.

Petitioner attempts to argue that it is the subject of some discrimination as a result of the challenged orders and that this discrimination constitutes a violation of the petitioner's "rights." The record discloses, however, that in spite of the Plan, the petitioner may compete on equal terms with all other travel agents and even with the airlines in selling transportation. Petitioner attacks the Board's orders on the ground that it is placed at a disadvantage in competing with credit card companies. The ready answers to this contention are multifold: (1) the petitioner is not restrained from effectuating any credit arrangements that it desires in its relationship with its own clients; (2) credit card companies, which are fundamentally purchasers of accounts receivable, perform a different function than do travel agents;[3] and, (3) the opera-

---

3. The American Express Company is an exception to this generalization, since it performs both travel agent and credit card functions.

tions and policies prevalent in the credit card companies' activities in the air transportation field were the subject of the Civil Aeronautic Board's Passenger Credit Plans Investigation, Order E-19197, and are, accordingly, not properly involved in the present orders.

We conclude that no legal or property right of the petitioner is impinged by the action of the Civil Aeronautics Board in the challenged orders. It is our opinion that at best the petitioner is deprived of a privilege or permission which it previously enjoyed but that this privilege or permission did not create any property or legal right which would establish the basis for a hearing before agency action depriving petitioner of this privilege or permission.

Viewing petitioner's present action from another standpoint, it is observed that this case contains a complaint that the Board's orders will expose the petitioner to competition of a type that it has not heretofore suffered. In other words, the petitioner says that the Board's orders will require it to compete on an equal remittance basis with all other travel agents, whereas heretofore it enjoyed a privilege of monthly remuneration. The short answer to this contention was expressed by this court in an analogous situation in the case of Texas State AFL–CIO v. Kennedy, 117 U.S.App.D.C. 343, 345, 330 F.2d 217, 219 (1964), cert. denied 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36 (1964):

> "Absent such a congressional grant, mere economic competition made possible by governmental action (even if allegedly illegal) does not give standing to sue in the courts to restrain such action."

Similarly, the economic competition made possible by the alleged unauthorized administrative action in this case does not entitle the petitioner to a hearing. Eastern Airlines v. Civil Aeronautics Board, 87 U.S.App.D.C. 331, 185 F.2d 426, 429 (1950), vacated as moot 341 U.S. 901, 71 S.Ct. 613, 95 L.Ed. 1341 (1951).

The petitioner has no license or exclusive franchise protected by law, and although it may be injured—or even ruined—by competition, this is lawful competition presenting a clear case of *damnum absque injuria*. Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, 928 (1955), cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). The Civil Aeronautics Board's responsibility, created by statute, *id est*, Section 1382, Title 49 U.S.Code, is to approve any agreement which it finds not to be adverse to the public interest. The Board has so found, and in issuing its Order E-20741, it has not infringed upon any contractual property or other legal right of the petitioner.

It follows that the petitioner is without legal status enabling it to challenge the Board's action, and accordingly the petitioner's action must be dismissed.

It is so ordered.