IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-127

No. 313A21

Filed 16 December 2022

IN THE MATTER OF J.R.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 604, 2021-NCCOA-366, affirming an involuntary commitment order entered on 3 January 2020 by Judge Pat Evans in District Court, Durham County. Heard in the Supreme Court on 20 September 2022.

*Joshua H. Stein, Attorney General, by James W. Doggett, Deputy Solicitor General, and South A. Moore, General Counsel Fellow, for the State.*

*Glenn Gerding, Appellate Defender, by Wyatt Orsbon, Assistant Appellate Defender, for respondent-appellant.*

*Disability Rights North Carolina, by Lisa Grafstein, Holly Stiles, and Elizabeth Myerholtz, for Disability Rights North Carolina, National Association of Social Workers, Promise Resource Network, and Peer Voice North Carolina, amicus curiae.*

BERGER, Justice.

Respondent was involuntarily committed after the trial court concluded that respondent had a mental illness and was dangerous to himself. Based upon a dissent at the Court of Appeals, the issue before this Court is whether respondent's due process rights were violated when the trial court, in the absence of counsel for the petitioner, called witnesses and elicited testimony during the hearing. For the reasons stated below, we affirm the decision of the Court of Appeals that respondent's

due process rights were not violated.

## I.   Factual Background

In late fall 2019, respondent was found unconscious on a Durham street after he suffered an alcohol-induced seizure.  On December 9, 2019, a Duke University Medical Center (DUMC) physician, Dr. Ayumi Nakamura, petitioned for the involuntary commitment of respondent.  That same day, a magistrate entered an order for respondent to be taken into custody and held at DUMC while respondent awaited judicial review.

On January 3, 2020, respondent came before the trial court for an involuntary commitment hearing pursuant to N.C.G.S. § 122C-267.  N.C.G.S. § 122C-267 (2021).  Upon calling of the case for hearing, respondent's counsel immediately objected to the proceeding because the State did not have a representative present.  The trial court did not explicitly overrule counsel's objection but instead stated the following:

> [L]et the record reflect, that the Public Defend[er's] Office objects to this court proceeding in this hearing without the District Attorney's Office participating. The District Attorney's Office of Durham County has notified this [c]ourt that they will not be participating in these hearings as in prior years, and this [c]ourt intends to go forward with this hearing, and the Respondent is more than welcome to appeal this [c]ourt's decision.[1]

---

[1] The trial court noted that the Durham County District Attorney's Office had notified the trial court that it would not be participating, but it is unclear why the district attorney's office would have been expected to participate in this hearing at all when a doctor from DUMC was the petitioner in the case.  The record does not contain any reference to pending criminal charges, respondent's capacity to proceed in a criminal case, or a determination that respondent had been found not guilty of a criminal charge by reason of insanity.  *See* N.C.

¶ 4        The trial court then called Dr. Sandra Brown, a physician and psychiatrist from DUMC who had been subpoenaed to testify. The court began direct examination of Dr. Brown by asking her the following: "state your name and occupation for this [c]ourt, and tell me what it is you want me to know about this matter."

¶ 5        Dr. Brown testified that respondent had a history of chronic obstructive pulmonary disease (COPD) and alcohol use disorder, and he had been hospitalized approximately eight times in the prior year for alcohol withdrawal or for hyponatremia, related to the disorder.  Respondent also suffered from deficits in executive functioning and bipolar disorder which caused manic episodes.  Respondent had not received full treatment for his conditions because he left against medical advice on each admission.  Additionally, respondent had been squandering his retirement money, had been homeless, was drinking regularly, and had been charged frequently with being intoxicated in public.

¶ 6        The trial court then asked Dr. Brown, "Anything else?"  Dr. Brown responded by explaining that respondent's behavior of spending money was likely due to his alcohol use disorder and the bipolar manic episodes that he was experiencing as a result of his bipolar disorder, and she opined that these behaviors were "likely to cause harm to self."  Dr. Brown expressed concern that respondent would not get

---

Const. art. IV, § 18; N.C.G.S. §§ 7A-61; 122C-264(d)–(d1), 122C-268(c), 122C-268.1, 122C-276 (2021).

necessary medications and that he would not be properly tapered off a potentially dangerous and addictive medication if he were not involuntarily committed.

¶ 7     Again, the trial court asked, "Anything else?" Dr. Brown responded that she had nothing more to share with the court. Respondent's counsel then cross-examined Dr. Brown. After cross examination concluded, the following exchange occurred:

> [Trial Court]: Dr. Brown, is it your testimony that the Respondent is a danger to himself?
>
> [Dr. Brown]: Yes.
>
> [Trial Court]: All right. And what about whether or not he's a danger to others?
>
> [Dr. Brown]: I believe, at this time, he is not a direct danger to others, but in the past he has been intoxicated in public, and it's hard to predict what someone like that might do.
>
> [Trial Court]: All right. And how long are you asking that he be committed for?
>
> [Dr. Brown]: We're asking for 30 days, given that we're not sure exactly what will happen with the guardianship proceedings, and we feel that it's important for that to be settled, as far as creating a safe plan for aftercare.
>
> [Trial Court]: All right. Based on my questions, does the Respondent have anything else they wish to ask this witness?
>
> [Respondent's counsel]: No, Your Honor.
>
> [Trial Court]: All right. . . . Any other evidence on behalf of the Petitioner?
>
> [No audible response.]
>
> [Trial Court]: Will there be any other evidence on behalf of

the Respondent?

¶ 8    Counsel for respondent then called respondent to the witness stand. Respondent testified on his own behalf. He expressed that he did not feel that he has ever posed a threat to himself or others. He answered affirmatively when asked by his counsel whether he was aware that he had a mental health diagnosis and that he needed medication to treat his mental health issues. He also expressed a desire to "be responsible for [him]self" but would be willing to work with a guardian. Once respondent's counsel concluded questioning respondent, the trial court asked respondent, "Anything else you want me to know . . .?" Respondent replied in the negative.

¶ 9    The trial court then asked respondent's counsel, "Do you wish to be heard further, counsel? Any other evidence? Any argument?" Respondent's counsel responded that she had no further evidence to present on respondent's behalf and the trial court allowed respondent's counsel to proceed to closing argument.

¶ 10    At the end of the hearing, the trial court stated that it found that respondent had a mental illness and was a danger to himself, and the trial court entered a thirty-day commitment order. Further, the trial court made written findings that there was clear, cogent, and convincing evidence to support involuntary commitment; that respondent was suffering from bipolar disorder, COPD, and alcohol abuse; and that respondent was a danger to himself.

Respondent gave notice of appeal in open court and subsequently filed a written notice of appeal.[2] On July 20, 2021, a divided panel of the Court of Appeals affirmed the trial court's order of commitment "for the reasons stated in the majority opinion and concurring opinion addressing the 'Due Process Concerns' issue in *In re C.G.*, [278] N.C. App. [416], 2021-NCCOA-344." *In re J.R.*, 278 N.C. App. 604, 2021-NCCOA-366, ¶ 7; *see In re C.G.*, 278 N.C. App. 416, 2021-NCCOA-344, ¶ 25 (finding that "the trial court did not violate Respondent's right to an impartial tribunal"). The dissenting judge in *In re C.G.* stated that he could not "conclude that Respondent received a full and fair hearing before a neutral officer of the court." *Id.* ¶ 46 (Griffin, J., dissenting).

Respondent appeals to this Court based upon the dissent at the Court of Appeals. On November 15, 2021, this Court allowed respondent's motion to designate respondent's case as the lead case on appeal. In his appeal, respondent contends that the Court of Appeals erred in determining that his due process rights were not violated. Specifically, respondent argues that the trial court failed to remain independent and impartial when it "elicited the evidence supporting [respondent]'s involuntary commitment and then, based on the evidence the judge introduced,

---

[2] Five other respondents appealed from involuntary commitments orders on similar grounds. *See In re C.G.*, No. COA20-520 (Durham); *In re Q.J.*, No. COA20-551 (Durham); *In re C.G.F.*, No. COA20-574 (Durham); *In re E.M.D.Y.*, No. COA20-685 (Durham); *In re R.S.H.*, No. COA20-777 (Durham).

decided to involuntarily commit [respondent]." Respondent implicitly requests a blanket rule that would prohibit the trial court from asking questions which elicit evidence and satisfy the burden of proof because, in so doing, the trial court ceases to be impartial. We decline to adopt such a rule.

## II. Analysis

¶ 13 Both our federal and state constitutions require due process. The Constitution of the United States declares that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend XIV, § 1, and our State Constitution states that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land," N.C. Const. art. I, § 19.

¶ 14 Under our law, "anyone who has knowledge of an individual who has a mental illness and is either (i) dangerous to self . . . or dangerous to others . . . or (ii) in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness," may file an affidavit and petition the court to have the individual involuntarily committed. N.C.G.S. § 122C-261(a) (2021). After the initial affidavit is filed, the clerk or magistrate must determine whether "reasonable grounds" exist to believe that the facts in the affidavit are true, respondent has a mental illness, and one of the aforementioned criteria are met, before taking the individual into custody. N.C.G.S. § 122C-261(b).

¶ 15    Once an individual is taken into custody, the individual must go before a commitment examiner for further determinations of whether the requirements for involuntary commitment are met. N.C.G.S. §§ 122C-263(c), 122C-263(d)(2). If the examiner recommends involuntary commitment, the individual must be admitted to a 24-hour facility where the individual must be examined by a physician to determine once again if the criteria for involuntary commitment are met. N.C.G.S. §§ 122C-263(d)(2), 122C-266.

¶ 16    From that point, if the physician recommends involuntary commitment, within ten days a hearing must take place before the trial court. N.C.G.S. § 122C-268(a). An individual may be involuntarily committed if the trial court finds "by clear, cogent, and convincing evidence" that the respondent is mentally ill and is a danger to himself or others. N.C.G.S. § 122C-268(j).

¶ 17    An individual facing involuntary commitment has numerous procedural protections, including the right to counsel, N.C.G.S. § 122C-268(d); the right to have the commitment reports and other relevant documents shared with the trial court, N.C.G.S. § 122C-266(c); and the right to confront and cross examine witnesses. N.C.G.S. § 122C-268(f).

¶ 18    It is uncontroverted that an involuntary commitment proceeding implicates the deprivation of a liberty interest, triggering due process concerns. The Supreme Court of the United States has "repeatedly . . . recognized that civil commitment for

any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323 (1979) (citing *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972)); *Humphrey v. Cady*, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Specht v. Patterson*, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967)). One such element of due process protection is the presence of an independent decisionmaker. *See Vitek v. Jones*, 445 U.S. 480, 495–96, 100 S. Ct. 1254, 1264–65, 63 L. Ed. 2d 552 (1980) (holding that the district court properly determined the procedures necessary, including that an independent decisionmaker is a requirement of due process, in the involuntary commitment context). "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 1613, 64 L. Ed. 2d 182 (1980). Accordingly, "a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955).

¶ 19 However, this Court has recognized that "[j]udges do not preside over the courts as moderators, but as essential and active factors or agencies in the due and orderly administration of justice. It is entirely proper, and sometimes necessary, that they ask questions of a witness . . . ." *State v. Hunt*, 297 N.C. 258, 263, 254 S.E.2d 591, 596 (1979) (quoting *Eekhout v. Cole*, 135 N.C. 583, 583, 47 S.E. 655, 657 (1904)).

Further, instances arise that *require* the trial court to ask questions to fulfill its role in the judicial process. In *State v. Perry*, this Court declared that "there are times in the course of a trial, when it becomes *the duty* of the judge to propound competent questions in order to obtain a proper understanding and clarification of the testimony of the witness or to bring out some fact that has been overlooked." 231 N.C. 467, 470, 57 S.E.2d 774, 776 (1950).

¶ 20        Notably, the rules of evidence contemplate that the court will actively participate in proceedings. Rule 614 of the North Carolina Rules of Evidence expressly allows judges to participate by calling witnesses and questioning them. The rule states that "[t]he court may, on its own motion . . . call witnesses, and all parties are entitled to cross-examine witnesses thus called." N.C.G.S. § 8C-1, Rule 614(a) (2021). Additionally, "[t]he court may interrogate witnesses, whether called by itself or by a party." N.C.G.S. § 8C-1, Rule 614(b) (2021). In neither case does a trial court shed its impartiality or abandon its role as an independent decisionmaker.

¶ 21        Respondent contends, however, that when counsel for a petitioner does not appear, the trial court acts as prosecutor for the State when it asks questions and elicits testimony which tends to support the commitment of respondent. It is true, as respondent argues, that in *Vitek*, the U.S. Supreme Court concluded that involuntary commitment proceedings are adversarial in nature. 445 U.S. at 495, 100 S. Ct. at 1265. However, "[w]hat makes a system adversarial rather than inquisitorial is not

the presence of counsel . . . but rather, the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2, 111 S. Ct. 2204, 2210, 115 L. Ed. 2d 158 (1991). In this case, the judge properly decided on the basis of facts presented at the hearing and arguments of the parties—respondent, respondent's counsel, and a doctor at DUMC who sought to have respondent committed for his health. As such, the judge did not take on the role of a prosecutor merely because counsel was not present.

¶ 22 Under our law, a trial court does not, and cannot as a matter of practicality, automatically cease to be impartial when it merely calls witnesses and asks questions of witnesses which elicit testimony. Such an argument elevates form over substance and would have potentially far-reaching, negative consequences for various types of pro se cases, contempt proceedings, domestic violence actions and sensitive juvenile hearings, let alone commitment proceedings. As the Supreme Court has stated, an argument such as respondent's "assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity." *Richardson v. Perales*, 402 U.S. 389, 410, 91 S. Ct. 1420, 1432, 28 L. Ed. 2d 842 (1971).

¶ 23 Here, a bench trial occurred based upon a petition filed by DUMC. No jury

was present, and there was no risk of any improper influence by the trial court's actions. *See State v. Smith*, 240 N.C. 99, 102, 81 S.E.2d 263, 265 (1954) (announcing that "the probable effect or influence upon the jury" prevents a judge from casting doubt on the credibility of a witness or impeaching a witness such that it would prejudice either party). The trial court did not ask questions designed or calculated to impeach any witnesses, the judge merely asked questions based upon the contents of the petition, such as asking whether there was "anything else" that the witness would like to say and asking the witness to "tell [the court] what it is you want [the court] to know about this matter." The most specific questions asked by the trial court were clarifying questions to fulfill the trial court's *duty* to "obtain a proper understanding and clarification of the testimony of the witness" to confirm whether the requirements for involuntary commitment had been met. *Perry*, 231 N.C. at 470, 57 S.E.2d at 776.

In *State v. Stanfield*, the Court of Appeals found that when "the judge asked a neutral question which, depending upon the answer would benefit either the State or the defendant," no violation of due process occurred. 19 N.C. App. 622, 626, 199 S.E.2d 741, 744 (1973). In short, even though the "testimony tended to prove an element" of the offense with which the defendant was charged, it was not sufficient to be improper questioning by the judge. *Id.* at 626, 199 S.E.2d at 744.

Here, the trial court remained an independent decisionmaker, and the answers

to the trial court's questions weighed toward commitment of respondent. The testimony given in response to the court's questions established the required elements to have respondent committed, but like *Stanfield*, that alone is not sufficient to find a violation of due process. The trial court did not advocate for any particular resolution and did not exceed constitutional bounds with its questions even though the responses supported involuntary commitment.

¶ 26        Respondent argues that the trial court attempted to fulfil two roles of both adjudicator and prosecutor. While we disagree that the trial court stepped into any role other than its proper role as an independent decisionmaker, we recognize that the United States Supreme Court has addressed the ability of an adjudicator to perform dual roles. In doing so, the Court has found that due process is not violated when the same individual both investigates and adjudicates, while making it clear that when the accuser doubles as the adjudicator, due process is violated. *Withrow v. Larkin*, 421 U.S. 35, 52, 95 S. Ct. 1456, 1467, 43 L. Ed. 2d 712 (1975); *Williams v. Pennsylvania*, 579 U.S. 1, 8, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016); *In re Murchison*, 349 U.S. at 139, 75 S. Ct. at 627.

¶ 27        In the context of administrative agencies, the Supreme Court of the United States has rejected "the bald proposition . . . that agency members who participate in an investigation are disqualified from adjudicating." *Withrow*, 421 U.S. at 52, 95 S. Ct. at 1467. Put another way, both investigating and adjudicating a matter is not

sufficient, standing alone, to disqualify a judge for lacking impartiality.

Yet, the Supreme Court has also concluded that the same person acting as accuser and adjudicator offends due process. *Williams*, 579 U.S. at 8, 136 S. Ct. at 1905 (citing *In re Murchison*, 349 U.S. at 136). In *Murchison*, the judge acted as a grand jury and then tried cases as the judge. 349 U.S. at 137, 75 S. Ct. at 625. The Court held that due process was violated when a judge acted as both a grand jury, the accuser, and the adjudicator of the case. *Id.* at 139, 75 S. Ct. at 627.

Here, however, the trial court did not function as an investigator or an accuser. The trial court did not investigate the underlying facts or initiate the filing of the petition to have respondent committed; those functions, i.e., being the investigator and the accuser, were performed by individuals with DUMC. The trial court simply presided over the hearing and asked questions to increase understanding and illuminate relevant facts to determine whether respondent met the necessary conditions for commitment.

By calling the witness from DUMC to testify and asking even-handed questions, the trial court did not advocate for or against the involuntary commitment of respondent; it merely heard evidence in conjunction with contents of the petition and applied the law to the facts as presented. These neutral and clarifying questions do not call into question the trial court's impartiality and do not offend due process.

### III. Conclusion

For the reasons stated herein, the trial court did not violate respondent's due process right to an impartial tribunal, and we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

*In re J.R.* and its companion cases[1] arose when Duke Hospital, a private entity, filed a petition for the involuntary commitment of each of the six respondents in these cases. Under North Carolina law, counsel for the State must appear at any hearing concerning an involuntary commitment at a state facility, such as those at one of the State's three regional psychiatric hospitals or at UNC Hospitals in Chapel Hill. N.C.G.S. §§ 122C-268(b), 122C-270(f) (2021). But when a person is held in custody for treatment at private facilities, counsel for the State is under no statutory obligation to appear. § 122C-268(b). For commitments related to private facilities, like those at Duke Hospital, "the Attorney General *may*, in his discretion, designate an attorney who is a member of his staff to represent the State's interest." *Id.* (emphasis added). This statute differs substantially from that of other states which explicitly contemplate the issue before this Court and provide that counsel for the State or petitioning party must appear and present the case to the trial court.[2]

---

[1] *See In re C.G.*, No. 308A21; *In re R.S.H.*, No. 317A21; *In re E.M.D.Y.*, No. 279A21; *In re Q.J.*, No. 309A21; *In re C.G.F.*, No. 312A21. These cases were consolidated for oral argument on this due process issue.

[2] *See, e.g.,* N.D. Cent. Code § 25-03.1-19(2) (Lexis, effective Aug. 1, 2021) ("At the hearing, evidence in support of the petition must be presented by the state's attorney, private counsel, or counsel designated by the court."); Kan. Stat. Ann. § 59-2959(e) (Lexis, effective July 1, 2022) ("If the petitioner is not represented by counsel, the county or district attorney shall represent the petitioner, prepare all necessary papers, appear at the hearing and present such evidence as the county or district attorney determines to be of aid to the court in determining whether or not there is probable cause to believe that the person with respect to whom the request has been filed is a mentally ill person subject to involuntary commitment

The majority holds that there is no due process violation when a person is involuntarily committed after a trial judge comingles adjudicatory and prosecutorial functions by eliciting the testimony of witnesses and building the record that then is the basis to support the individual's involuntary commitment so long as the judge merely asks "even-handed questions" that are "neutral and clarifying. However, when

for care and treatment under this act, and that it would be in the best interests of the person to be detained until the trial upon the petition."); Iowa Code § 229.12(1) (West, effective July 1, 2018) ("At the hospitalization hearing, evidence in support of the contentions made in the application shall be presented by the county attorney."); N.J. Stat. Ann. § 30:4-27.12(b) (West, effective Aug. 11, 2010) ("[T]he assigned county counsel is responsible for presenting the case for the patient's involuntary commitment to the court, unless the county adjuster is licensed to practice law in this State, in which case the county adjuster shall present the case for the patient's involuntary commitment to the court."); Minn. Stat. § 253B.08(5a) (West, effective Aug. 1, 2020) ("The proposed patient or the patient's counsel and the county attorney may present and cross-examine witnesses, including court examiners, at the hearing."); Haw. Rev. Stat. § 334-60.5(e) (West, effective July 1, 2018) ("The attorney general, the attorney general's deputy, special deputy, or appointee shall present the case for hearings convened under this chapter, except that the attorney general, the attorney general's deputy, special deputy, or appointee need not participate in or be present at a hearing whenever a petitioner or some other appropriate person has retained private counsel who will be present in court and will present to the court the case for involuntary hospitalization."); Or. Rev. Stat. § 426.095(3) (West, effective June 16, 2015) ("The person alleged to have a mental illness and the individual representing the state's interest shall have the right to cross-examine all the following: (a) Witnesses. (b) The individual conducting the investigation. (c) The examining physicians or other licensed independent practitioners who have examined the person."); Fla. Stat. § 394.467(6)(a)(2) (West, effective July 1, 2016) ("The state attorney for the circuit in which the patient is located shall represent the state, rather than the petitioning facility administrator, as the real party in interest in the proceeding."); Ariz. Rev. Stat. Ann. § 36-503.01 (West, effective July 1, 2016) ("Whenever a physician or other person files a petition for court-ordered evaluation or court-ordered treatment on behalf of a state or county screening, evaluation or mental health treatment agency, the attorney general or the county attorney for the county in which the proceeding is initiated, as the case may be, shall represent the individual or agency in any judicial proceeding for involuntary detention or commitment and shall defend all challenges to such detention or commitment."); 18 Vt. Stat. Ann. § 7615(d) (Lexis, effective July 1, 2014) ("The attorney for the State and the proposed patient shall have the right to subpoena, present, and cross-examine witnesses, and present oral arguments.").

a party does not appear, the judge necessarily must comingle these functions, thereby abandoning their role as an impartial decisionmaker and violating the respondent's right to due process. *See Sung v. McGrath*, 339 U.S. 33, 46 (1950), *superseded by statute as recognized in Marcello v. Bonds*, 349 U.S. 302 (1955). To be sure, a trial judge is placed in a difficult position when deciding whether to proceed after hearing from the State that it would "not be participating in these hearings" even though it had elected to do so "in prior years." This is the functional equivalent of a party failing to appear at all. It is one thing for a trial court to proceed when a party appears but is unrepresented by counsel, it is quite another thing for a trial court to proceed when a party with the burden of proof fails to appear.

¶ 34        Setting up a straw man by taking respondent's argument to illogical extremes, the majority mischaracterizes respondent's position as "implicitly request[ing] a blanket rule that would prohibit the trial court from asking questions which elicit evidence and satisfy the burden of proof because, in so doing, the trial court ceases to be impartial." Respondent and the amicus party in these cases are seeking the fundamental due process guarantees of a neutral factfinder and a truly adversarial process when an individual's personal liberty is at stake. They are not arguing that a trial court can never ask a witness a question. The problem in these cases is that the trial court elected to proceed to hear a case when one party failed to appear. The fact

that, as the majority points out, the respondent has a right to counsel does not satisfy their right to a neutral decisionmaker.

¶ 35          When a person is involuntarily committed to a psychiatric hospital, they experience a "massive curtailment of liberty." *Vitek v. Jones*, 445 U.S. 480, 491 (1980) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)). Accordingly, the person has a "powerful" "interest . . . in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment." *Id.* at 495. In the case of involuntary commitment, the deprivation of liberty does not stop with the person's "loss of freedom from confinement" and involuntary commitment — as the name implies — also involves "[c]ompelled treatment." *Id.* at 492 (citing *Addington v. Texas*, 441 U.S. 418, 427 (1979)). Involuntary commitment also comes with serious collateral consequences such as restrictions on a parent's fundamental right to custody and control of their children, being forbidden from owning a firearm, and being prohibited from obtaining several types of professional licenses, including a license to practice law. *See In re Carter*, 25 N.C. App. 442, 443–44 (1975) (wife's involuntary commitment "may well affect the determination" of her child custody dispute with her husband); *District of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008) ( "longstanding prohibitions" on the possession of firearms by people suffering from mental illness are "presumptively lawful"); N.C.G.S. § 83A-15(a) (2021) (architectural license may be denied, suspended, or revoked due to mental disability); N.C.G.S. § 84-28(g) (2021)

(law license may be inactivated because of mental incompetence); N.C.G.S. § 90-14(a) (2021) (medical license may be revoked due to mental illness); N.C.G.S. § 90-171.37(a) (2021) (nursing license may be denied, suspended, or revoked because of mental illness). Indeed, a person's involuntary commitment is "always an ominous presence" that may be used to attack their competence, credibility, and character whenever there is "any interaction between the individual and the legal system." *In re Hatley*, 291 N.C. 693, 695 (1977) (quoting *In re Ballay*, 482 F.2d 648, 652 (D.C. Cir. 1973)). Our society can also be unkind to people with mental illness, and "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we [must] recognize that [involuntary commitment] . . . can have a very significant impact on the individual." *Vitek*, 445 U.S. at 492 (first and second alterations in original) (quoting *Addington*, 441 U.S. at 425–26). Accordingly, the United States Supreme Court has acknowledged that "an erroneous commitment is sometimes as undesirable as an erroneous conviction." *Addington*, 441 U.S. at 428 (citing J. Wigmore, Evidence § 1400 (Chadbourn rev. 1974)).

¶ 36 A person cannot be committed against their will without due process of law. *Addington*, 441 U.S. at 425. This concept is expressly stated in *Addington*, which noted that the United States Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.*; *see, e.g., Jackson v. Indiana*, 406 U.S. 715

(1972); *Humphrey*, 405 U.S. 504; *In re Gault*, 387 U.S. 1 (1967); *Specht v. Patterson*, 386 U.S. 605 (1967). The hallmark of due process is "fundamental fairness" *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24 (1981), and in the context of judicial proceedings, this equates to the right to a "full and fair hearing," *Miller v. French*, 530 U.S. 327, 350 (2000). This right is essential in guarding against erroneous involuntary commitment and is designed to give the person to be committed the ability to "understand the nature of what is happening to him" and to "challenge the contemplated action." *Vitek*, 445 U.S. at 496.

¶ 37        J.R. argues that in these circumstances, the trial court acts as a prosecutor for the State when it elicits testimony that supports commitment of the respondent. In response, the majority acknowledges that the United States Supreme Court held in *Vitek*, 445 U.S. 480, that involuntary commitment proceedings are adversarial proceedings but then illogically maintains that because a medical doctor testified as a witness in this case, the trial judge did not actually take on the role of a prosecutor.

¶ 38        The adversarial nature of involuntary commitment hearings was indeed acknowledged by the United States Supreme Court in *Vitek*, 445 U.S. 480, and *Addington*, 441 U.S. 418. The Court observed that these proceedings are based on an "essentially medical" question, *Vitek*, 445 U.S. at 495, and the determination "turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington*, 441 U.S. at 429. It is precisely because of this, and " '[t]he

subtleties and nuances of psychiatric diagnoses' that . . . the requirement of adversary hearings [is justified]." *Vitek*, 445 U.S. at 495 (first alteration in original) (quoting *Addington*, 441 U.S. at 429); *see also Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (Louisiana's statutory commitment procedure for insanity acquittee violated due process because, among other things, it failed to provide the acquittee with an "adversary hearing"); *French v. Blackburn*, 428 F. Supp. 1351, 1356 (M.D.N.C. 1977) (involuntary commitment procedure under repealed Chapter 122 of the General Statutes afforded due process because, among other things, it provided "a full adversary hearing"), *aff'd*, 443 U.S. 901 (1979); *Logan v. Arafeh*, 346 F. Supp. 1265, 1270 (D. Conn. 1972) (because Connecticut's involuntary commitment statute required "an adversary hearing," among other things, it complied with due process), *aff'd sub nom., Briggs v. Arafeh*, 411 U.S. 911 (1973). Further, over thirty years ago our own Court of Appeals held that one of the safeguards in commitment cases guaranteed by due process is "a full adversary hearing." *In re Hernandez*, 46 N.C. App. 265, 269 (1980) (citing *French*, 428 F. Supp. 1351).

¶ 39        The adversarial model is distinct from "the inquisitorial model in which the judge — a neutral decisionmaker — conducts an independent investigation" and instead "our adversarial system requires the parties to present their own arguments and evidence at trial." *State v. Lawrence*, 365 N.C. 506, 512 (2012). It follows that under this model, the judge must decide whether a person is to be involuntarily

committed based on the "facts and arguments pro and con adduced by the parties" and not based on the judge's own "factual and legal investigation." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991).

¶ 40        Although the majority acknowledges that involuntary commitment hearings are subject to due process protections, they hold that "[i]t is entirely proper, and sometimes necessary, that [a judge] ask questions of a witness," citing *State v. Hunt*, 297 N.C. 258, 263 (1979). In doing so, they cite two of this Court's decisions in criminal cases, *Hunt*, 297 N.C. 258, and *State v. Perry*, 231 N.C. 467 (1950). However, these cases are not analogous to J.R.'s case because they contemplate an entirely different scenario and thus answer a separate question, namely if a judge may ask questions of a witness in criminal cases where both parties are represented by counsel. Because of the nature of criminal cases, the State was required to appear and put on its case by calling witnesses, introducing evidence, and eliciting testimony. Thus, in those cases it may become "the duty of the judge to propound competent questions in order to obtain a proper understanding and clarification of the testimony of the witness or to bring out some fact that has been overlooked" without violating the defendant's due process rights. *Perry*, 231 N.C. at 470. Importantly, J.R. does not argue that there is a due process violation any time a judge asks a question. Rather, he argues that in this case the judge did not simply ask the doctor a question or two to clarify her testimony or develop some overlooked fact, as this Court contemplated in *Perry*.

*See Perry*, 231 N.C. at 470. Instead, the trial court called the only witness, asked all the questions, and elicited all the evidence used to support J.R.'s commitment.

¶ 41 The majority also notes that under *State v. Stanfield*, 19 N.C. App 622, 626 (1973), there is no due process violation even when a trial court elicits the testimony used to prove an element of the crime in a criminal case. However, as noted above, criminal cases are not analogous because both parties are represented by counsel. In the involuntary commitment context where an attorney for the State or petitioner is not present, the situation discussed in *Stanfield* does not exist and the judge will be forced, perhaps unwillingly, to act as the prosecuting party by calling all the witnesses and eliciting the testimony and other evidence necessary to commit the respondent.

¶ 42 The majority also states that because this was a bench trial, and there was no jury present, "there was no risk of any improper influence by the trial court's actions," citing *State v. Smith*, 240 N.C. 99, 102 (1954). But this conclusion does not address J.R.'s argument. J.R. does not contend that the trial court's questions improperly influenced a jury, instead his argument is that when a trial judge elicits testimony and weighs the evidence, there is a risk that the judge's impartiality is compromised. This principle was recognized nearly one hundred years ago by the United States Supreme Court in *Tumey v. Ohio*, 273 U.S. 510 (1927), where the Court explained that the test for impartiality is not whether judges "of the highest honor and the

greatest self-sacrifice could carry . . . on [the proceeding] without danger of injustice," *id.* at 532. Instead, the test for impartiality is whether the judicial procedures "offer a possible temptation to the average [person] as a judge to forget the burden of proof required . . . or which might lead [them] not to hold the balance nice, clear, and true between the [S]tate and the accused." *Id.* The Supreme Court later affirmed this principle in *Sung*, 339 U.S. 33, where the Court noted that when the trial court has "at once" the responsibility of "presenting" the case and "appraising [its] strength," a "genuinely impartial hearing conducted with critical detachment, is psychologically improbable if not impossible," *id.* at 44. Accordingly, the Court concluded that "commingling" the functions of "investigation or advocacy" and "deciding" are "plainly undesirable." *Id.*

¶ 43        Additionally, in *In re Spivey* this Court has recognized that due process requires a neutral decisionmaker. 345 N.C 404, 417 (1997).  There, a local district attorney was judicially removed from office after repeatedly calling an African American man a racial slur in public to provoke a fight. *Id.* at 408, 416. On appeal, the former district attorney argued the trial court had violated his due process rights by appointing independent counsel to present the evidence concerning his conduct because the appointment had "resulted in his being removed by a court which had directed and controlled the discovery and presentation of evidence against him." *Id.* at 417. But this Court rejected that argument reasoning that because the trial judge

"should not both present the case against a district attorney and pass judgment on the case" the judge had the power to appoint independent counsel. *Id*. Thus, there was no due process violation.

¶ 44        Furthermore, the majority states that in the administrative agency context, the United States Supreme Court has rejected "the bald proposition . . . that agency members who participate in an investigation are disqualified from adjudicating," quoting *Withrow v. Larkin*, 421 U.S. 35, 52 (1975). However, administrative agencies are subject to Section 554 of the Administrative Procedure Act which states that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision." 5 U.S.C. § 554(d). Thus, many areas of federal agency law are subject to greater due process protections than the involuntary commitment proceedings contemplated in J.R.'s case.

¶ 45        At least two other states have held that in the context of involuntary commitment proceedings, a due process violation exists when the judge takes on the role of the prosecutor and questions the witness in support of commitment. In *In re Commitment of Raymond* S., 263 N.J. Super. 428, 432 (Super. Ct. App. Div. 1993), New Jersey's intermediate appellate court explained:

> Although we were advised at oral argument that county counsel was present at the hearing, it is not reflected in the transcript. The case for commitment was advanced by the judge rather than by county counsel. Such

> procedure is inappropriate because of the statutory requirement that county counsel present the case for commitment, and also because it places the judge in the role of an adversary rather than that of a neutral decision maker.

*Id.* at 432. The Iowa Supreme Court has also found a due process violation when the judge "elicit[ed] testimony that . . . support[ed] the applicants' burden of proof." *In re S.P.*, 719 N.W.2d 535, 539 (Iowa 2006). In *In re S.P.*, the court held

> that an analysis based solely upon the nature of the questions asked by the referee or district court judge is not wholly determinative of the issue of advocacy. We cannot provide the trial court a cookbook of right or wrong questions, but merely observe that any effective questioning will inevitably lead to the heart of the case. When the court itself directs the case in this way it is marshaling or assembling the evidence. Artfully crafted questions will not hide the court's role in the proceedings at that point—the role of deciding what evidence is needed to prove the case and steering the case down that road.

*Id.* at 539–40. There, the court cautioned against a case-by-case approach when a due process violation is raised due to the commingling of adjudicatory and prosecutorial functions.

¶ 46        Today, the majority affirms an unfortunate case-by-case legal standard where due process protections depend not on the adherence to well-established procedures of an adversarial process but rather on the particular questions asked by the judge. More fundamentally, this leaves trial judges, when faced with no party appearing as petitioner in a private-facility involuntary commitment proceeding, with the

unenviable task of deciding how to present all the evidence necessary to meet the standard for involuntary commitment while also determining whether they have done a good enough job of doing so. The majority's opinion sets out some parameters by identifying the features that made the process in these cases adequate. Additionally, a trial judge cannot use language or conduct themselves in a way "which conceivably could be construed as advocacy in relation to petitioner or as adversative in relation to the respondent." *In re Q.J.*, 278 N.C. App. 452, 2021-NCCOA-346, ¶ 21 (quoting *In re Perkins*, 60 N.C. App. 592, 594 (1983)). Similarly, trial courts must "be careful to avoid prejudice to the parties." *Id.* ¶ 22 (citing *State v. Howard*, 15 N.C. App. 148, 150–51 (1972)). Finally, trial courts in these circumstances may not impeach a witness's credibility. *Id.* Based on our own caselaw, any of the above instances would violate a respondent's due process right to a neutral decisionmaker.

¶ 47     Finally, it is important to note that due process standards in these proceedings serve not only to protect against erroneous commitments but also ensure that the commitment process is not overused. Under N.C.G.S. § 122C-268(j) (2021), an involuntary commitment order must be supported by findings demonstrating "clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . . or dangerous to others." Under § 122C-3(11)(a), a person is considered a danger to themselves and can be involuntarily committed if:

> a. Within the relevant past, the individual has done any of the following:

1.  The individual has acted in such a way as to show all of the following:

I.  The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.

II. There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

2. The individual has attempted suicide or threatened suicide and that there is a reasonable probability of suicide unless adequate treatment is given pursuant to this Chapter.

3. The individual has mutilated himself or herself or has attempted to mutilate himself or herself and that there is a reasonable probability of serious self-mutilation unless adequate treatment is given pursuant to this Chapter.

§ 122C-3(11)(a)(1), (2), (3). Under this standard, "[p]revious episodes of dangerousness to self, when applicable, may be considered when determining reasonable probability of physical debilitation, suicide, or self-mutilation." *Id.* at § 11(a)(3). Furthermore, under North Carolina law, a person can be involuntarily

committed if they are a danger to others. *Id*. at § 11(b). A person is considered a

danger to others if:

> Within the relevant past, the individual has inflicted or
> attempted to inflict or threatened to inflict serious bodily
> harm on another, or has acted in such a way as to create a
> substantial risk of serious bodily harm to another, or has
> engaged in extreme destruction of property; and that there
> is a reasonable probability that this conduct will be
> repeated. Previous episodes of dangerousness to others,
> when applicable, may be considered when determining
> reasonable probability of future dangerous conduct. Clear,
> cogent, and convincing evidence that an individual has
> committed a homicide in the relevant past is prima facie
> evidence of dangerousness to others.

*Id*. By requiring the above be shown, our law attempts to guard against overuse of

and erroneous commitment.[3] However, the law cannot have its intended effect

without full due process protections in place. Overuse of involuntary commitment is

concerning for both the person being committed unnecessarily against their will and

for our state. An overreliance on institutional treatment is generally more expensive

and less effective than community-based alternatives. *See* N.C. Dep't of Health &

Hum. Servs., *Strategic Plan for Improvement of Behavioral Health Services* 5, 87-88

(Jan. 31, 2018). https://medicaid.ncdhhs.gov/ media/3907/download. North Carolina

---

[3] Reports indicate that in the last decade involuntary commitment use has increased by ninety-one percent in North Carolina. Taylor Knopf, *NC didn't track the data on mental health commitments, so some advocates did it instead*, North Carolina Health News (Dec. 21, 2020),https://www.northcarolinahealthnews.org/2020/12/21/nc-didnt-track-the-data-on-mental-health-commitments-so-some-advocates-did-it-instead/.

data also shows that certain groups are more likely to be subjected to care in psychiatric hospitals, namely males and African Americans, and this likely correlates to their limited access to community-based services. *See* Tech. Assistance Collaborative, *An Assessment of the North Carolina Department of Health and Human Services' System of Services and Supports for Individuals with Disabilities: Submitted to the North Carolina Department of Health and Human Services* 93 (Apr. 30, 2021), https://www.ncdhhs.gov/media/12607 /download? attachment. But a lack of access to community-based services should not render involuntary psychiatric hospitalization the only available form of treatment. Thus, ensuring that appropriate due process protections exist in involuntary commitment proceedings is paramount to guaranteeing that only those who truly require hospitalization are subjected to it against their will.

¶ 48        Therefore, I would hold that in civil involuntary commitment proceedings in which a petitioner fails to appear, a trial judge cannot put on the case for them, eliciting and then evaluating all the evidence. By doing so the trial court inevitably commingles the separate and distinct functions of prosecutor and neutral decisionmaker and denies the respondent in the proceeding important procedural due process guarantees that have long been understood to be a vital element of our adversarial system of justice.

Justices HUDSON and MORGAN join in this dissenting opinion.